**John LARSON, individually and John Larson as father and natural guardian of Jessica Larson, a minor, Appellant,**

v.

**Loree Carol DUNN, a/k/a Jennifer Dunn, et al., Defendants,**

**Franklin Rigenhagen, et al., Rick Olson, Respondents.**

No. C7–89–1139.

Court of Appeals of Minnesota.

Jan. 2, 1990.

Review Granted Feb. 21, 1990.

Terry W. Viesselman, Wilhelm & Viesselman, P.A., Fairmont, for appellant.

James R. Carlson, Muir, Heuel, Carlson & Spelhaug, P.A., Rochester, for Franklin Rigenhagen, et al.

Steven R. Sunde, Sunde, Olson, Kircher and Zender, Saint James, for Rick Olson.

Heard, considered and decided by HUSPENI, P.J., and SHORT and KLAPHAKE, JJ.

## OPINION

SHORT, Judge.

John Larson appeals from the dismissal of his action against respondents for intentional interference with the custody of his minor child. The trial court dismissed the case for failure to state a claim upon which relief can be granted. We affirm in part, reverse in part and remand for further proceedings consistent with this opinion.

### FACTS

Appellant alleges the following facts. The marriage between appellant John Larson and Loree Dunn a/k/a Loree Larson was dissolved on November 5, 1980. Under the dissolution decree, the trial court awarded permanent custody of the parties' minor child, Jessica Larson, to John Larson. Before the marriage dissolution, temporary custody of Jessica had been awarded to Dunn with visitation privileges granted to Larson.

On the evening of November 5, 1980, Larson went to the home of respondents Franklin and Carol Rigenhagen, Dunn's parents, to pick up Jessica pursuant to a scheduled visitation. Franklin Rigenhagen refused to surrender Jessica to Larson,

stating Larson would have permanent custody of Jessica the next day. Rigenhagen then slammed the door on Larson's hand.

The next day, Larson returned to the Rigenhagen home with a copy of the judgment and decree to obtain custody of Jessica. Upon arriving, Franklin Rigenhagen told Larson that Dunn had fled with Jessica. Larson contacted local law enforcement authorities, and an arrest warrant was issued for Dunn.

In 1985, Larson learned from the Federal Bureau of Investigation (F.B.I.) that Dunn and Jessica had stayed with Dunn's aunt in California immediately after fleeing Minnesota, and that the Rigenhagens had helped to move them before Christmas of 1980. Based on this information, Larson commenced an action in federal court against the Rigenhagens, Loree Dunn, and the aunt in California. Larson later voluntarily dismissed the action in the face of denials by the defendants and the F.B.I.'s refusal to testify during an ongoing investigation. Dunn had not yet been located.

In August of 1987, federal authorities located and apprehended Dunn and Jessica in the state of Washington. During the intervening seven years, Larson expended over $50,000 in efforts to locate Jessica. As part of those efforts, the F.B.I. questioned the Rigenhagens about Jessica's whereabouts. Each denied any knowledge as to the location of Dunn or Jessica.

Upon being reunited with her father, Jessica stated that the Rigenhagens were frequent visitors while she and Dunn were outside Minnesota. According to Jessica, the Rigenhagens babysat her when Dunn remarried in 1983 and when her half-brothers were born. She stated that she was never permitted to go to the Rigenhagens' home. She also stated that her uncle, Rick Olson, had visited her while she was in hiding. Respondent Olson had denied to police and to Larson that he knew Jessica's location.

Larson filed this action against Dunn, the Rigenhagens, Olson and various other defendants who are not parties to this appeal. The complaint alleged intentional interference with custodial rights, intentional infliction of emotional distress, fraud, and civil conspiracy. The Rigenhagens and Olson moved for dismissal of the complaint for failure to state a claim upon which relief can be granted. The trial court granted the motion. The Rigenhagens alone moved for dismissal for lack of personal jurisdiction, and also moved for a stay pursuant to Minn.R.Civ.P. 41.04. The trial court denied both motions. Olson moved for summary judgment based on the pleadings and affidavits filed with the court. The trial court denied the motion, holding that genuine issues of material fact would remain if the custody tort is recognized on appeal, and that genuine issues of material fact exist as to the other alleged causes of action. Although the claims for emotional distress and fraud stated causes of action, the trial court apparently dismissed the entire complaint to make the case appealable.

## ISSUES

I.  Did the trial court err in dismissing a claim for intentional interference with custodial rights for failure to state a claim?

II. Did the trial court err in denying the Rigenhagens' motion to dismiss for lack of personal jurisdiction?

III. Did the trial court err in denying the Rigenhagens' motion for a stay pursuant to Minn.R.Civ.P. 41.04?

## ANALYSIS

### I.

Appellant Larson asks this court to recognize his claim for intentional interference with custodial rights. No Minnesota statute authorizes this cause of action and no prior Minnesota appellate court case has considered it. The supreme court has said that the novelty of a claim is no reason for denying its existence. *Miller v. Monsen*, 228 Minn. 400, 406, 37 N.W.2d 543, 547 (1949). It has also said:

[T]he development of the common law is within the proper sphere of judicial authority and responsibility.  * * *

\* \* \* Lack of precedent cannot absolve a common-law court from responsibility for adjudicating each claim that comes before it on its own merits. *Salin v. Kloempken,* 322 N.W.2d 736, 741 (Minn.1982). The history of this court and the supreme court is replete with examples of the recognition of novel claims.[1] Minnesota appellate courts have refused to recognize new claims that are not authorized by existing law and also conflict with public policy.[2] Thus, it is our duty to ascertain whether recognition of the tort of intentional interference with custodial rights promotes or conflicts with the public policy of this state, as evidenced by legislative and judicial declarations.

## A. Background

Between 100,000 and 750,000 children are stolen from one parent by the other parent each year. L. Karp & C. Karp, *Domestic Torts: Family Violence, Conflicts & Sexual Abuse,* § 5.01 (1989). Often the parent who abducts the child is aided by friends and family. *Id.* Seventy percent of these children are never returned to their custodial parent. Note, *Tortious Interference With Custody: An Action to Supplement Iowa Statutory Deterrents to Child Snatching,* 68 Iowa L.Rev. 495, 495 (1983).

The legislative response to parental child abduction has been dramatic. The Uniform Child Custody Jurisdiction Act (UCCJA) has been enacted in every state, the District of Columbia, and Puerto Rico. *Karp, supra; see* Minn.Stat. § 518A.01–.25 (1988). The UCCJA provides for a single jurisdiction in which to resolve custody disputes, and thus removes the incentive to abduct the child and seek a custody determination in a more favorable forum. *See* Comment, *Parental Kidnapping in Minnesota,* 13 Wm. Mitchell L.Rev. 985, 998–99 (1987). On the federal level, Congress enacted the Parental Kidnaping Prevention Act of 1980 to facilitate enforcement of custody decrees and deter the unilateral abduction and removal of children. Parental Kidnaping Prevention Act of 1980, Pub.L. No. 96–611, 94 Stat. 3566 (codified in scattered sections of 18, 28 and 42 U.S. C.). The federal law provides for exclusive, continuing jurisdiction in the home state in custody determinations, unless the home state declines to exercise its jurisdiction or does not fulfill the jurisdictional requirements. *See* 28 U.S.C.A. § 1738A(c), (d), (f), (g) (West Supp.1989). The federal law also attaches a criminal penalty to parental kidnapping cases. *See* 18 U.S.C.A. § 1073 (West 1976 & Supp.1989).

Minnesota has made parental child abduction a felony. Minn.Stat. § 609.26 (1988 & Supp.1989). The proscribed conduct includes child abduction and concealment. *Id.,* subd. 1. It is a defense if the abductor or concealer reasonably believed the child was physically endangered while in the custody of the parent. *Id.,* subd. 2. The cost of returning the child to the custodial parent may be allocated to the wrongdoer. *Id.,* subd. 4.

■ Contrary to respondents' arguments, the existence of a criminal penalty for particular conduct does not deprive the

**1.** *See, e.g., Hubbard v. United Press International, Inc.,* 330 N.W.2d 428, 438–39 (Minn.1983) (recognizing independent tort of intentional infliction of emotional distress); *McCormack v. Hankscraft Co.,* 278 Minn. 322, 339–40, 154 N.W.2d 488, 500–01 (1967) (adopting theory of strict liability for product defects); *R.A.P. v. B.J.P.,* 428 N.W.2d 103, 106 (Minn.Ct.App.1988) (recognizing claim for negligent transmission of herpes), *pet. for rev. denied* (Minn. Oct. 19, 1988); *Phipps v. Clark Oil & Refining Corp.,* 396 N.W.2d 588, 592 (Minn.Ct.App.1986) (recognizing claim for wrongful discharge), *aff'd,* 408 N.W.2d 569 (Minn.1987).

**2.** *See Salin v. Kloempken,* 322 N.W.2d 736, 738–39 (Minn.1982) (refusing to recognize consor-

tium claim for child's loss of parent's society); *Bock v. Lindquist,* 278 N.W.2d 326, 327 (Minn. 1979) (refusing to recognize parent's claim for alienation of child's affections); *Stubbs v. North Memorial Medical Center,* 448 N.W.2d 78, 83 (Minn.Ct.App.1989) (refusing to recognize claim of tortious breach of physician-client relationship); *H.J. Inc. v. Northwestern Bell Corp.,* 420 N.W.2d 673, 676 (Minn.Ct.App.1988) (refusing to recognize bribery tort), *pet. for rev. denied* (Minn. May 16, 1988); *Higgins v. J.C. Penney Casualty Insurance Co.,* 388 N.W.2d 429, 431 (Minn.Ct.App.1986) (refusing to recognize claim by parent against tortfeasor who injures adult child), *pet. for rev. denied* (Minn. Aug. 13, 1986).

injured person of a civil remedy. Minn. Stat. § 611A.05 (1988). We recognize, however, that a criminal statute does not automatically give rise to a civil cause of action unless the statute expressly or by clear implication so provides. *H.J. Inc. v. Northwestern Bell Corp.*, 420 N.W.2d 673, 675 (Minn.Ct.App.1988), *pet. for rev. denied* (Minn. May 16, 1988). No such language appears in Minn.Stat. § 609.26. Neither the federal nor the state laws authorize a cause of action for damages by the victimized parent.

## B. The tort of intentional interference with custodial rights.

To fill the void, virtually every state that has considered the issue has adopted the tort of intentional interference with custodial rights.[3] A very few states have rejected or deferred recognition of the tort.[4]

3. *Alabama: Armstrong v. McDonald,* 39 Ala. App. 485, 103 So.2d 818 (1958); *Rayford v. Rayford,* 456 So.2d 833 (Ala.Civ.App.1984).
*California: Surina v. Lucey,* 168 Cal.App.3d 539, 214 Cal.Rptr. 509 (1985); *Rosefield v. Rosefield,* 221 Cal.App.2d 431, 34 Cal.Rptr. 479 (1963) (conspiracy claim allowed against grandparents who directly participated in carrying away child).
*Colorado: D & D CATV Construction, Inc. v. Pace,* 780 P.2d 520 (Colo.1989) (en banc).
*D.C.: Bennett v. Bennett,* 682 F.2d 1039 (D.C.Cir. 1982) (applying D.C. law).
*Georgia: Mathews v. Murray,* 101 Ga.App. 216, 113 S.E.2d 232 (1960).
*Idaho: Shields v. Martin,* 109 Idaho 132, 706 P.2d 21 (Idaho 1985).
*Illinois: Kunz v. Deitch,* 660 F.Supp. 679 (N.D. Ill.1987) (applying Illinois law); *see Dymek v. Nyquist,* 128 Ill.App.3d 859, 83 Ill.Dec. 52, 469 N.E.2d 659 (1 Dist.1984). *But see Whitehorse v. Critchfield,* 144 Ill.App.3d 192, 98 Ill.Dec. 621, 494 N.E.2d 743 (4 Dist.1986), *appeal denied* (Ill. Oct. 2, 1986).
*Indiana: Montgomery v. Crum,* 199 Ind. 660, 161 N.E. 251 (1928) (by implication).
*Iowa: Wood v. Wood,* 338 N.W.2d 123 (Iowa 1983).
*Louisiana: Spencer v. Terebelo,* 373 So.2d 200 (La.Ct.App.1979), *cert. denied,* 376 So.2d 960 (La.1979). *But see Johns v. Johns,* 471 So.2d 1071 (La.Ct.App.1985) (holding no damages available for refusal to comply with custody order); *Owens v. Owens,* 471 So.2d 920 (La.Ct. App.1985) (holding no tort for interference with visitation rights), *cert. denied,* 475 So.2d 362 (La.1985).
*Maine: Finn v. Lipman,* 526 A.2d 1380 (Me. 1987) (declining to reach issue, but quoting extensive authority supporting cause of action).
*Maryland: Wasserman v. Wasserman,* 671 F.2d 832 (4th Cir.1982) (applying Maryland law); *Hixon v. Buchberger,* 306 Md. 72, 507 A.2d 607 (1986) (declining to reach issue, but quoting extensive authority supporting cause of action).
*Michigan: Brown v. Brown,* 338 Mich. 492, 61 N.W.2d 656 (1953), *cert. denied,* 348 U.S. 816, 75 S.Ct. 27, 99 L.Ed. 644 (1954).
*Missouri: Kramer v. Leineweber,* 642 S.W.2d 364 (Mo.Ct.App.1982); *Kipper v. Vokolek,* 546 S.W.2d 521 (Mo.Ct.App.1977).
*New Hampshire: Plante v. Engel,* 124 N.H. 213, 469 A.2d 1299 (1983).

*New Jersey: DiRuggiero v. Rodgers,* 743 F.2d 1009 (3d Cir.1984) (applying New Jersey law).
*New York: Kajtazi v. Kajtazi,* 488 F.Supp. 15 (E.D.N.Y.1978) (applying New York law); *Pickle v. Page,* 252 N.Y. 474, 169 N.E. 650 (1930); *McEntee v. New York Foundling Hospital,* 21 Misc.2d 903, 194 N.Y.S.2d 269 (N.Y.App.Div. 1959).
*North Carolina: Howell v. Howell,* 162 N.C. 283, 78 S.E. 222 (1913); *Coleman v. Shirlen,* 53 N.C. App. 573, 281 S.E.2d 431 (1981) (using civil conspiracy theory); *LaGrenade v. Gordon,* 46 N.C.App. 329, 264 S.E.2d 757 (1980), *appeal dismissed,* 300 N.C. 557, 270 S.E.2d 109 (1980).
*Ohio: Clark v. Bayer,* 32 Ohio St. 299 (1877).
*Oregon: McBride v. Magnuson,* 282 Or. 433, 578 P.2d 1259 (1978) (en banc); *Franson v. Radich,* 84 Or.App. 715, 735 P.2d 632 (1987).
*Rhode Island: Bedard v. Notre Dame Hospital,* 89 R.I. 195, 151 A.2d 690 (1959).
*Texas: Fenslage v. Dawkins,* 629 F.2d 1107 (5th Cir.1980) (applying Texas law); *Silcott v. Oglesby,* 721 S.W.2d 290 (Tex.1986); *see also Oglesby v. Silcott,* 728 S.W.2d 141 (Tex.Ct.App.1987) (remand of supreme court decision); Tex.Fam. Code Ann. §§ 36.01–.08 (Vernon 1986).
*Washington: In re Marriage of Hall,* 25 Wash. App. 530, 607 P.2d 898 (1980) (assuming for purposes of case that Washington recognizes tort, but finding facts insufficient to establish personal jurisdiction).
*Wisconsin: Lloyd v. Loeffler,* 539 F.Supp. 998 (E.D.Wis.1982), *aff'd,* 694 F.2d 489 (7th Cir. 1982) (applying Wisconsin law). *But see Gleiss v. Newman,* 141 Wis.2d 379, 415 N.W.2d 845 (Wis.Ct.App.1987) (refusing to adopt tort of interference with visitation rights; distinguishing *Lloyd,* which concerned custody rights).

4. *Florida: McDougald v. Jenson,* 596 F.Supp. 680 (N.D.Fla.1984) (applying Florida law), *aff'd,* 786 F.2d 1465 (11th Cir.1986).
*Pennsylvania: Bartanus v. Lis,* 332 Pa.Super. 48, 480 A.2d 1178 (1984) (not clearly rejecting tort where facts averred did not satisfy elements of tort).
*Vermont: Schuppin v. Unification Church,* 435 F.Supp. 603 (D.Vt.1977) (court construed claim as an action for alienation of adult child's affections), *aff'd,* 573 F.2d 1295 (2nd Cir.1977). *But see Sheltra v. Smith,* 136 Vt. 472, 392 A.2d 431 (1978) (holding parental child abduction com-

The tort of intentional interference with custodial rights is defined as follows:

> One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent.

Restatement (Second) of Torts § 700 (1977). Thus, a plaintiff must prove:

(1) The plaintiff had legal custody of a minor child;

(2) The defendant abducted, compelled, or induced the child to leave the plaintiff, or refused to return the child to the plaintiff; and

(3) The defendant knew the plaintiff did not consent.

The comments to section 700 make clear that the defendant's conduct must be affirmative and purposeful, and that mere knowledge of an abducted child's whereabouts is not enough to trigger liability. *Id.*, comments a, b. Only a parent with legal custody may bring an action. *Id.*, comment c. A parent may be liable to the other parent if by judicial decree sole custody of the child has been awarded to the other parent. *Id.* The Restatement recognizes an affirmative defense for one who rescues the child from unlawful physical violence inflicted by the parent. *Id.*, comment e. To succeed in this defense, however, a defendant must have had an objectively reasonable belief that the child would suffer immediate harm unless rescued. *Id.*

C. Public Policy

The purpose of tort law is to allocate losses arising out of human activities. *Prosser & Keeton on the Law of Torts* § 1, at 6 (W. Keeton 5th ed. 1984) (hereinafter *Prosser & Keeton* ). Tort law compensates the victim for injuries sustained as a result of another's conduct. *Id.* Thus, we will recognize a new tort only if Minnesota policy favors compensating the injuries redressed by the new tort.

The tort of intentional interference with custodial rights is intended to provide the

custodial parent a remedy for (1) loss of society of the child; (2) emotional distress of the parent; (3) lost services of the child; (4) reasonable expenses incurred in regaining custody of the child; and (5) reasonable expenses incurred in treating or caring for the child as a result of the interference. Restatement (Second) of Torts § 700 comment g. We think Minnesota public policy favors redressing these injuries, and a single tort action allowing compensation for all five injuries is a useful and appropriate vehicle to address the growing societal phenomenon of parental child abduction.

1. *Lost society.*

The Minnesota legislature has abolished causes of action for alienation of affections, criminal conversation, seduction, and breach of contract to marry. 1978 Minn. Laws ch. 515, § 2 (codified at Minn.Stat. § 553.01–.03 (1988)). The legislature declared these heart balm actions "have been subject to grave abuses, have caused intimidation and harassment, to innocent persons and have resulted in the perpetration of frauds." Minn.Stat. § 553.01. Accordingly, the legislature declared the public policy of this state was best served by abolition of these actions.

The heart balm causes of action were intended to protect the marital relationship from interference by third parties. *Prosser & Keeton* § 124, at 917–19. However, the statute abolishing these causes of action has been construed to abolish a cause of action intended to protect the parent-child relationship. In *Bock v. Lindquist,* 278 N.W.2d 326 (Minn.1979), the supreme court refused to recognize a cause of action by the parent against a third party for alienation of a child's affections. Although Minn.Stat. ch. 553 had not yet become effective, the court reasoned the statute represented a clear statement that a cause of action for alienation of a child's affections was contrary to public policy. *Bock,* 278 N.W.2d at 328.

The policy demonstrated by the abolition of the alienation torts does not conflict with

pensable under intentional infliction of emo-      tional distress theory).

the proposed custody tort. According to Prosser:

> The gist of the [alienation] tort is not sexual intimacy but an interference with the marital relation that changes one spouse's mental attitude toward the other.

*Prosser & Keeton* § 124, at 918; *see also Pedersen v. Jirsa*, 267 Minn. 48, 52, 125 N.W.2d 38, 41–42 (1963). The alienation tort therefore focuses on the change in mental attitude of the spouse or child. The custody tort, by contrast, focuses on the physical removal of a child from the custody of the parent. The problems of proof which are inherent in alienation torts, and which caused the legislature to abolish them, are not present in the custody tort. Experience has shown it is virtually impossible to show the interference of a third party caused a change in the mental attitude of a spouse or child. There is no parallel problem of proof in the custody tort. Thus, the policy demonstrated by the abolition of the heart balm torts does not oppose the recognition of the custody tort.

The supreme court noted in *Bock* that the opinion does not diminish "other remedies for interference with familial relationships." *Bock*, 278 N.W.2d at 328. The court said:

> Violations of judicial orders establishing custodial or visitational rights in one parent may in appropriate situations be corrected by habeas corpus or, more commonly, by citation for contempt of court.

*Id.* Finally, the court noted that an action for enticement of a child still exists under Minnesota law. *Id.*

Enticement involves persuasion rather than force. *Black's Law Dictionary* 477 (5th ed. 1979). It is therefore conduct covered by the custody tort. The supreme court's recognition that the loss of a child's society is compensable under Minnesota law strongly suggests the same injury ought to be compensable under a custodial interference tort.

### 2. *Emotional distress.*

The second injury the custody tort remedies is emotional distress caused by the abduction of the child. This injury is compensable under the tort of intentional infliction of emotional distress. *See Hubbard v. United Press International, Inc.*, 330 N.W.2d 428, 438–39 (Minn.1983). We think public policy favors compensating this injury by use of the custody tort. *Cf. Potthoff v. Jefferson Lines, Inc.*, 363 N.W.2d 771, 777 (Minn.Ct.App.1985) (allowing compensation for reasonably forseeable emotional distress in an action for intentional interference with a contract).

### 3. *Lost services.*

The third injury the custody tort remedies is lost services caused by the abduction. Minnesota law has long recognized that the lost services of a child is a compensable injury to the parent. *See Eichten v. Central Minnesota Cooperative Power Association*, 224 Minn. 180, 194–95, 28 N.W.2d 862, 871 (1947); *Higgins v. J.C. Penney Casualty Insurance Co.*, 388 N.W.2d 429, 430 (Minn.Ct.App.1986) (dictum), *pet. for rev. denied* (Minn. Aug. 13, 1986).

### 4. *Expenses.*

The fourth injury for which the custody tort provides a remedy is expenses reasonably incurred in attempting to locate and retrieve the child. The parental kidnapping statute allows the court to require the wrongdoer to pay the expense of returning the child to its custodial parent. Minn.Stat. § 609.26, subd. 4. The statute does not appear to authorize payment to the victimized parent. However, the victim's rights statute provides some guidance. The wrongdoer may be required to provide restitution to the victims of the crime. Minn. Stat. § 611A.04 (Supp.1989). "Victim" is defined broadly to include anyone who incurs loss or harm as a result of a crime. Minn.Stat. § 611A.01(b) (1988). These statutes set forth a clear statement of policy that the wrongdoer should bear the cost of the child abduction.

Other jurisdictions have held these expenses recoverable by a victimized parent as costs incurred in the successful enforcement of a prior custody decree. *See Ray-*

*ford v. Rayford,* 456 So.2d 833, 834 (Ala. Civ.App.1984). Under either theory, Minnesota policy supports imposing the economic cost of child abduction on the wrongdoer.

### 5. *Reasonable expenses incurred in treating the child.*

The final injury the custody tort remedies is reasonable expenses incurred or likely to be incurred in treating the child if it has suffered from defendant's tortious conduct. Restatement (Second) of Torts § 700 comment g. Minnesota law allows a parent to recover for a child's medical expenses incurred due to an injury by a wrongdoer. *Eichten,* 224 Minn. at 195, 28 N.W.2d at 871.

### D. Conclusion.

■ Minnesota public policy supports compensating each of the injuries redressed by the tort of intentional interference with custodial rights. We therefore recognize a tort for use against those who interfere with the relationship between the custodial parent and child, as defined by the Restatement (Second) of Torts § 700.

Respondents argue against recognition of the tort because of evidence suggesting appellant sexually abused his child. This evidence was obviously rejected by the trial court that determined custody. However, we recognize an affirmative defense for those who rescue a child with the objectively reasonable belief that the child is in danger.[5] *See* Restatement (Second) of Torts § 700 comment e.

To be actionable under this tort, defendant's conduct must amount to abduction, compulsion, or inducement. Mere knowledge of the abduction scheme or of the location of the child and a failure to come forward is not enough to incur liability, absent some special status which would impose a duty on the defendant to come forward with the information. The conduct must be active and purposeful participation in a plan to remove the child from the custodial parent or to keep the child away. *Cf.* Minn.Stat. § 609.05 (1988) (holding criminally liable one who intentionally aids, advises, hires, counsels or conspires with or otherwise procures another to commit a crime). A simple untruthful denial to police and others that the defendant knew where the child was is not enough to incur liability, nor is refusal to cooperate with an investigation necessarily actionable. A lie that goes beyond mere denial, however, may result in liability. For example, if the defendant misleads the police or others in a manner calculated to delay or prevent recovery of the child, liability may result.

While we are reluctant to add another weapon to the arsenal already available for use by family members against one another, we think the custody decree vests the custodial parent with a legally protectible interest in a relationship with the child. The tort of intentional interference with custodial rights is an appropriate means of remedying interference with that relationship. We therefore reverse the trial court and remand for further proceedings consistent with this opinion.

## II.

■ The Rigenhagens argue the trial court lacked personal jurisdiction over them. We disagree. The burden is on the plaintiff to prove the minimum contacts necessary to satisfy due process. *Hardrives, Inc. v. City of LaCrosse,* 307 Minn. 290, 293, 240 N.W.2d 814, 816 (1976); *Stangel v. Rucker,* 398 N.W.2d 602, 604 (Minn. Ct.App.1986), *pets. for rev. denied* (Minn. Mar. 13, 25, 1987). On a motion to dismiss for lack of personal jurisdiction, the facts alleged in the complaint and affidavits are taken as true. *Stangel,* 398 N.W.2d at 604–05.

---

**5.** The custody determination does not render this issue res judicata for the simple reason that the issues are not the same. In the custody proceeding, the issue is whether the custodial parent in fact abused the child. In the tort case the issue is whether the defendants had a rea- sonable belief the child was in danger. Further, respondents in this case were not all parties to the custody determination. Thus, respondents will have an opportunity to present their affirm- ative defense.

The Rigenhagens assert, without authority, that an exercise of personal jurisdiction cannot be based on contacts that are no longer actionable under the statute of limitations. This argument is baseless; it confuses the jurisdiction of the trial court to render an in personam judgment against a nonresident defendant with an unrelated public policy regarding the prosecution of stale claims as represented by the statute of limitations. Although some interplay exists between these two legal doctrines, *see Long v. Moore*, 295 Minn. 266, 270, 204 N.W.2d 641, 643 (1973), whether a claim is time barred is an issue separate from the issue of personal jurisdiction. Since no motion was made pertaining to the former, we address only the issue of personal jurisdiction.

Before a Minnesota court can exercise personal jurisdiction over a nonresident defendant, the court must determine, first, whether the statutory standard of Minnesota's long-arm statute is satisfied, and second, whether the exercise of personal jurisdiction passes constitutional muster. *Sherburne County Social Services ex rel. Pouliot v. Kennedy*, 426 N.W.2d 866, 867 (Minn.1988). The mere fact that an alleged tortfeasor departs from and resides out of state after a cause of action accrues does not rob this state of its personal jurisdiction over the defendant. *See Duresky v. Hanson*, 329 N.W.2d 44, 47 (Minn.1983); *Howells v. McKibben*, 281 N.W.2d 154, 156–57 (Minn.1979).

Personal jurisdiction extends to those nonresident individuals who commit acts in Minnesota causing injury or property damage. Minn.Stat. § 543.19, subd. 1(c) (1988). A tort is committed in Minnesota, for purposes of applying the long-arm statute, if damage from the alleged tortious conduct resulted in Minnesota. *Anderson v. Luitjens*, 311 Minn. 203, 206, 247 N.W.2d 913, 915 (1976).

In this case, damage from the alleged tortious conduct of the Rigenhagens did occur in Minnesota. Larson has not only suffered emotionally, but he has borne the expense of efforts aimed at obtaining his daughter's return. All of these damages were incurred as a result of the Rigenhagens' alleged tortious conduct. Because the alleged tort occurred in Minnesota, Minn.Stat. § 543.19, subd. 1(c) authorizes the court to exercise personal jurisdiction over the Rigenhagens.

As to the second part of the analysis, whether maintenance of the suit passes constitutional muster, the focus is on the relationship among the defendant, the forum and the litigation. *Kennedy*, 426 N.W.2d at 868. This relationship is defined by the defendant's contacts with the forum state, not with its residents. *West American Insurance Co. v. Westin, Inc.*, 337 N.W.2d 676, 679 (Minn.1983). In determining whether minimum contacts exist between the nonresident defendant and this state, the court examines five factors: (1) the quantity of contacts with the state, (2) the nature and quality of those contacts, (3) the connection or relationship between the contacts and the cause of action, (4) the state's interest in providing a forum, and (5) the convenience of the parties. *Marquette National Bank of Minneapolis v. Norris*, 270 N.W.2d 290, 295 (Minn.1978). The first three factors are primary; the others receive less consideration. *Id.*

Larson alleges a number of significant contacts between the Rigenhagens and this state that are interwoven with the present action. The genesis of the present litigation occurred in Minnesota in November of 1980. At the Rigenhagens' home, Franklin Rigenhagen refused to surrender Jessica to Larson, slamming the door on Larson's hand. The Rigenhagens continued to reside in Minnesota for almost two years after Jessica's abduction and flight from Minnesota. During that time the Rigenhagens' repeatedly denied any knowledge of Jessica's whereabouts to investigating authorities. Even after leaving Minnesota the Rigenhagens' involvement with the state continued. Franklin Rigenhagen, through correspondence and telephone to the state, acted as a "go-between" in communications between Dunn and Larson. The Rigenhagens maintained a post office box in Minnesota for this purpose. Finally, the Rigenhagens had a number of contacts with Minnesota that are less directly relat-

ed to Larson's claims, including two visits to this state after moving to California and the ownership of real property and assets of a car dealership.

The facts and circumstances of this case indicate the Rigenhagens have deliberately and purposefully engaged in significant activities within this state such that they could reasonably anticipate being haled into court here. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *Kennedy,* 426 N.W.2d at 870. Sufficient minimum contacts exist between the Rigenhagens and this state to sustain the exercise of personal jurisdiction over them.

### III.

The Rigenhagens argue the trial court abused its discretion in denying their motion for a stay pursuant to Minn.R. Civ.P. 41.04. We disagree. That rule provides:

> If a plaintiff who has once dismissed an action in any court commences an action based upon or including the same claim against the same defendant, the court may make such order for the payment of costs of the action previously dismissed as it may deem proper and may stay the proceedings in the action until the plaintiff has complied with the order.

A stay should not be granted under this Rule, nor should costs be imposed when the first action was brought in good faith, especially when the plaintiff is unable to pay the costs. *Phoenix Canada Oil Co. v. Texaco, Inc.,* 78 F.R.D. 445, 448–49 (D.Del. 1978); *see also* 2 D. Herr & R. Haydock, *Minnesota Practice* 307–08 (1985).

The trial judge found Larson was unable to pay the Rigenhagens' costs of defending against the previous federal court action, and that the previous action was commenced and dismissed in good faith. Based on the record before us, we cannot say that the trial court abused its discretion in denying the Rigenhagens' request that the current action be stayed until Larson pays the costs incurred in the dismissed federal case.

### DECISION

A parent has a legally protectible interest against intentional interference with custodial rights. The trial court erroneously dismissed appellant's complaint for failure to state a claim upon which relief can be granted. However, the trial court correctly denied the Rigenhagens' motion to dismiss for lack of personal jurisdiction and their motion to stay the proceedings.

Affirmed in part, reversed in part and remanded.

HUSPENI, Judge (concurring in part and dissenting in part).

I concur with the majority's determination that sufficient minimum contacts exist between the Rigenhagens and this state to sustain the exercise of personal jurisdiction over them. I also concur with the determination that the trial court did not abuse its discretion in denying the Rigenhagens' requested stay. I respectfully dissent, however, from that portion of the majority opinion which recognizes the tort of intentional interference with custodial relations.

Initially I doubt the appropriateness of this court acting to recognize this tort. I believe instead that adoption of a cause of action which may so profoundly and permanently affect the intimate relationships between children and their parents, grandparents, aunts and uncles should be studied, debated, considered and announced by the legislature of this state or by this state's philosophical and doctrinal court.

My second doubt follows from the first, and is expressed sensitively by the majority in its statement that "we are reluctant to add another weapon to the arsenal already available for use by family members against one another." The majority answers its concern with the conclusion "the custody decree vests the custodial parent with a legally protectible interest in a relationship with the child [and] the tort * * * is an appropriate means of remedying interference with that relationship."[1] I

1. Remedy for interference with the legally pro-    tectible interest of a custodial parent in the

would answer the concern of the majority by requesting that Minnesota proceed most cautiously and deliberately in considering adoption of this cause of action. Today not only are courts making anguishing decisions in countless marital dissolution actions involving minor children, but they are cautioned by thoughtful voices both inside and outside the judicial system that courts of law are not particularly well-suited to resolve family relationship issues and perhaps alternative fora should be explored. Ill-considered adoption of the tort of intentional interference with custodial relations could provide a vehicle through which many of the most divisive and psychologically and financially draining aspects of marital dissolution actions would be broadened, deepened, extended and exacerbated.

Examination of the facts of this case demonstrates how important it is that public policy concerns be thoroughly explored and sensitively considered. All of the defendants here are relatives of the minor child. Two of the defendants are her maternal grandparents. It is almost certain that the minor children around whom future tort litigation would swirl would be related to many or most of the defendants.

Even the Minnesota criminal code recognizes that in certain instances the importance of preserving family relationships must take precedence over enforcing penal laws. (*See* Minn.Stat. § 609.495 (1988) which excepts from prosecution for aiding an offender to avoid arrest the spouse, parent or child of that offender.) Preservation of those family relationships should also be considered in deciding whether this new tort should be adopted and if it is to be adopted, how broad it should be. Ultimately, perhaps it would even be of value to inquire whether adoption of this new tort would properly reflect Minnesota's stated public policy of seeking always to serve the best interests of its minor children.

relationship with the child is presently available, of course, through Minn.Stat. § 609.26 (1988; Supp.1989). To the extent that a civil cause of action for intentional interference with custodial rights is "retributive," the criminal sanctions already in place more than adequately provide for retribution.