**Thelma HOYE, Movant,**

v.

**Laura HOYE, Respondent.**

**No. 90–SC–751–DG.**

Supreme Court of Kentucky.

Feb. 13, 1992.

Peter L. Ostermiller, Robert G. Stallings, Louisville, for movant.

J. Daniel Landrum, Louisville, for respondent.

STEPHENS, Chief Justice.

The sole issue this Court is asked to determine in this appeal is whether to abolish the common law tort of intentional interference with the marital relation. In a civil suit based on this cause of action, the Jefferson Circuit Court entered a jury verdict against Thelma York (now Hoye) awarding plaintiff, Laura Hoye $10,000 ($5,000 for past and future mental anguish, plus $5,000 for loss of companionship and society.)

The relevant facts are as follows. Steve Hoye, former husband of plaintiff, Laura Hoye, developed a business-social relationship with co-employee Thelma York in the fall of 1986. This relationship evolved; and Steve and Thelma became sexually intimate. In November of 1986, Steve moved from the marital residence. Shortly thereafter, Laura Hoye filed a divorce action to end a sixteen-year marriage in the Jefferson Circuit Court.

One day before issuance of the divorce, plaintiff, Laura Hoye, filed a civil complaint against the defendant, then Thelma York, alleging Mrs. York's tortious interference with the Hoye marriage. On July 22, 1987, a divorce decree was entered.

The Jefferson Circuit Court, in Laura Hoye's civil suit, denied defendant's pretrial motion for summary judgment. This motion requested dismissal of the complaint on grounds that the cause of action set forth should be abolished.

The Court of Appeals, finding the defendant's arguments persuasive, but lacking the power to abolish the common-law tort under SCR 1.030(8)(a), affirmed the trial court. We granted defendant's motion for discretionary review to determine whether or not the cause of action known as intentional interference with the marital relation should be abolished.

We conclude that the tort of intentional interference with the marital relation should be abolished because foundation of this action is based on the misperception that spousal affection is capable of theft by a third party. This concept, abandoned by the majority of the states, has its origin in the antiquated premise that a wife is her husband's chattel.

The early common law concept that the husband has exclusive right to his wife's services has given way to a new rationale explaining the underlying purpose of this cause of action. The basis for changing the reasoning behind the tort is alteration of the legal and social perceptions of the wife's role in a marriage. As the result of women acquiring independent status in the eyes of the law, courts in the early part of this century changed from property-based arguments to explain the continued existence of this cause of action to reasoning that it preserved the marital union. We find this rationale unpersuasive and hold that the tort of intentional interference with the marital relation is hereby abolished for the following reasons.

### HISTORICAL OVERVIEW OF INTENTIONAL INTERFERENCE WITH THE MARITAL RELATION

An overview of the origin of this cause of action provides the necessary framework for our analysis.

In Teutonic tribes adultery was a grave offense because it threatened pure blood lines. Legitimacy of children was a premium because offspring could not inherit from their mother since she was not of the

same rank as their father. Adultery thus was forbidden due to prejudice, not for moral reasons. The penalty most Teutonic tribes imposed on the wife's lover was payment of compensation to the husband, thus providing him means to purchase a new spouse. Buying a new wife insured the legitimacy of the husband's offspring. Lippman, *The Breakdown of Consortium*, 30 Colum.L.Rev. 651, 655 (1930).

The Anglo–Saxons based actions against third parties involving tortious interference with the marriage relation in trespass. The wife was considered a servant to her husband, his chattel. Thus since the wife was a superior servant, an action was available to include the loss of her services by enticement. Lippman, *supra* at 653.

Anglo–Saxon common law actions were seen as compensatory in nature. The husband's entitlement to consortium included a bundle of legal rights to his wife's services, society, and sexual intercourse. Later in this century courts added to consortium rights a fourth element of conjugal affection. See Lippman, *supra* at 652–53; Prosser and Keeton, THE LAW OF TORTS, § 124 at 916 (5th ed. 1984).

Early English common law established two causes of action which "for some purposes can simply be regarded as different means by which the marriage relationship is subjected to interference." Prosser and Keeton, *supra* at 917–919.

"The first, enticement (also called abduction), involved assisting or inducing a wife to leave her husband by means of fraud, violence, or persuasion. The injury was considered to be the loss of the wife's services or consortium. Enticement (or abduction) has evolved into what is commonly known today as the tort of alienation of affections. The second tort remedy available to an injured spouse at early common law was seduction, which today is commonly known as the tort of criminal conversation. Unlike enticement/abduction, seduction required an adulterous relationship between the plaintiff's spouse and the defendant; no physical separation of the husband and wife was necessary. The purpose underlying an action for seduction was to vindicate the husband's property rights in his wife's person and to punish the defendant for defiling the plaintiff's marriage and family honor, and for placing the legitimacy of children in doubt. Comment, *Stealing Love In Tennessee: The Thief Goes Free*, 56 Tenn.L.Rev. 629 (1989); Prosser and Keeton, *supra.*

In the late nineteenth and early twentieth centuries most states, including Kentucky, acted to equalize the legal status of wives with passage of Married Women's Property Acts. "These acts granted wives the right to own property and to sue in their own names to recover damages for their own personal injuries." Comment, *Alienation of Affections: Flourishing Anachronism*, 13 Wake Forest L.Rev. 585, 588 (1977).

The courts, with wives acquiring such rights, were then confronted with the issue as to the continued viability of the tortious causes of actions; alienation of affections and criminal conversation. Because the derivation of these torts was based on the legal inferiority of women, courts could reasonably determine to either deprive their use to a husband or to extend their use to a wife. Feinsinger, *Legislative Attack on "Heart Balm,"* 33 Mich.L.Rev. 979, 990 (1935); Lippman, *supra* at 662; Kavanagh, *Alienation of Affections and Criminal Conversation: Unholy Marriage in Need of Annulment*, 23 Ariz. L.Rev. 323, 329 (1981). Following the majority of courts, the Commonwealth granted these rights of action to the wife. *Dietzman v. Mullin*, 108 Ky. 610, 57 S.W. 247 (1900).

Extension of these rights of action to the wife necessitated adjusting their rationale. Historically these actions were viewed as property-based torts that compensated the husband for loss of services and protected pure blood lines. But this century, as the result of women acquiring legal status in the courts, alienation of affections and criminal conversation came to be seen as means to preserve marital harmony by deterring wrongful interference. Feinsinger, *supra* at 1008.

A legal fiction was thus created. As Justice Holmes stated:

a common phenomenon ... familiar to the students of history, is this. The customs, beliefs or needs of a primitive time establish a rule or a formula. In the course of centuries the custom, belief, or necessity, disappears, but the rule remains. The reason which gave rise to the rule has been forgotten, and ingenious minds set themselves to inquire how it is to be accounted for. Some ground of policy is thought of, which seems to explain it and to reconcile it with the present state of things and then the rule adapts itself to the new reasons which have been found for it, and enters a new career. The old form receives a new content and in time even the form modifies itself to fit the meaning which it has received. Lippman, *supra* at 672, citing THE COMMON LAW § 5.

The courts made no structural adjustments in actions related to intentional interference with the marriage when women obtained rights through the Married Women's Property Acts; thus the legal fiction of a spouse owning property rights in the mind and body of their partner continued. This is evidenced by continuing to disallow consent as a defense in criminal conversation and alienation of affections. Both these actions were historically based on the legal inferiority of the wife who was deemed incapable of consenting to the injury of her superior, her husband. H. Clark, THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES, § 4.2, p. 267 (1987).

Noting this situation, one commentator observed:

The idea that one spouse can recover for an act the other spouse has willingly consented to is perhaps better suited to an era that regarded one spouse as the property of another. Prosser and Keeton, *supra*, at 917.

While the rationale for the cause of action of tortious interference with the marital relation transformed during this century, its origin grounded in property concepts remained. Initially such suits were blatantly viewed as compensatory. But when a wife no longer qualified within legal perceptions as her husband's chattel, the reasoning explaining the purpose behind such actions was altered. Since the husband no longer owned his wife, courts justified the continued existence of this tort as a means to promote and maintain the marriage.

Though still viewed as compensatory in nature because it is a civil suit, in reality such cases are indeed punitive. The third party is seen as a malicious seducer wreaking havoc upon the harmonious marital couple. These common law actions thus reason that the third-party must be punished for his misdeeds by payment to the aggrieved spouse. H. Clark, *supra*, at 267; Feinsinger, *supra*, at 995.

## ABOLITION

The action for intentional interference with the marital relation is a doctrine created by this Court that incorporates judicially adopted common law torts of criminal conversation, enticement, and alienation of affections. *Skaggs v. Stanton*, Ky., 532 S.W.2d 442 (1975). Because this cause of action originated here, we have the power as an appellate court to resolve the question of whether to abolish it. *Craft v. Commonwealth*, Ky., 343 S.W.2d 150 (1961). Additionally, we are entitled to address its continued viability in the Commonwealth, since we find compelling reasons to do so that overshadow the policy and purposes established by precedent. *Hilen v. Hays*, Ky., 673 S.W.2d 713 (1984).

Both alienation of affections and criminal conversation are based on psychological assumptions that actions by an ill-intended third party can and will destroy a harmonious marriage. H. Clark, *supra*, at 267; Feinsinger, *supra* at 995. The Court of Appeals in denying a spouse the right to sue the marital partner for damages when the partner openly consorts with another person, reasoned its reluctance to involve the courts in these suits, saying:

"The morals of mankind are more perfectly judged by a court having final and eternal jurisdiction. *Browning v.*

*Browning,* Ky.App., 584 S.W.2d 406 (1979).

A comparison of contract actions alleging tortious interference with actions based on criminal conversation and alienation of affections reveals logical inconsistencies. Marital interference torts are distinguishable from actions for tortious interference with a contract against a third party because in contract suits the plaintiff can sue not only the third party but also the other party to the contract. In alienation of affections and criminal conversation the other party to the "contract" is the plaintiff's spouse who participated in the tort, and according to *Browning, supra,* this spouse may not be subject to a suit by the marital partner. This logical asymmetry has prompted the majority of jurisdictions to eliminate these marital torts.

The Iowa Supreme Court in abolishing the alienation of affections action reasoned:

Spousal love is not property which is subject to theft ... plaintiffs in suits for alienation of affections do not deserve to recover for the loss or injury to 'property' which they do not, and cannot, own. *Fundermann v. Mickelson,* 304 N.W.2d 790, 794 (Iowa 1981).

To posit that one person possesses rights to the feelings of another is an anachronism. Yet this is the foundation for tortious interference with the marital relation where the presence of a third party is blamed for changes in the marriage. *Kavanagh, supra,* at 338.

Tortious interference with the marital relation, as previously noted, has never sufficiently separated from its property based origins; a rationale that is counter to contemporary thought. Since the 1930s the majority of states have recognized inconsistencies in both actions of criminal conversation and alienation of affections, and have either judicially or legislatively abolished them, or severely limited their application through rigid statutory damage restrictions, or shortened statutes of limitation.[1]

England never had a cause of action for alienation of affections and Louisiana likewise failed to adopt it. *Moulin v. Monteleone,* 165 La. 169, 115 So. 447 (1927). Three states have abolished alienation of affections in the courts. *Fundermann, supra; Wyman v. Wallace,* 94 Wash.2d 99, 615 P.2d 452 (1980); *O'Neil v. Schuckardt,* 112 Idaho 472, 733 P.2d 693 (1986).

At least thirty-one jurisdictions, either through case law or statute, do not recognize the cause of action of criminal conversation.[2] *Hanover v. Ruch,* 809 S.W.2d 893 (Tenn.1991).

1. Alienation of Affections: Ala.Code 1975, § 6–5–331; Ariz.Rev.Stats. § 25–341; West's Ann. Cal.Civ.Code § 43.5; Colo.Rev.Stat.1973, 13–20–202; Conn.Gen.Stat.Ann. § 52–572b; 10 Del. Code § 3924; D.C.Code 1981, § 16–923; West's Fla.Stat.Ann. § 771.01; Official Ga.Code Ann. § 105–1203; West's Ann.Ind.Code 34–4–4–4; 19 Maine Rev.Stat.Ann. § 164; Md.Code, Courts & Jud.Proc., § 5–301 et seq.; Mich.Stats.Ann. § 27A.2901 [M.C.L.A. § 600.2901]; Minn.Stat. Ann. § 553.01; Mont.Code Ann. § 27–1–601 (1983); Nev.Rev.Stat. 41.380; N.J.Stat.Ann. 2A:23–1; N.Y.—McKinney's Civ. Rights Law § 80–a; Ohio Rev.Code § 2305.29; 76 Okl.Stat. Ann. § 8.1; 15 Vt.St.Ann. § 1001; Va.Code 1950, § 8.01–220; W.Va.Code 56–3–2a; Wis.Stat. Ann. § 248.01 renumbered by L.1979, c. 32, § 51 and is now § 768.01; Wyo.Stat.1977, § 1–101.

2. Ala.Code § 6–5–331 (1975); Cal.Civ.Code § 43.5 (West 1982); Colo.Rev.Stat. § 13–20–202 (1973); *Destefano v. Grabrian,* 763 P.2d 275, 279 (Colo.1988); Conn.Gen.Stat.Ann. § 52–572f (West Supp.1984); Del.Code Ann. tit. 10, § 3924 (1974); D.C.Code Ann. § 16–923 (1981); Fla.

Stat.Ann. § 771.01 (West 1964); *Harrington v. Pages,* 440 So.2d 521, 522 (Fla.App.1983); Ga. Code Ann. § 51–1–17 (1982); *Hyman v. Molodovan,* 305 S.E.2d 648, 166 Ga.App. 891 (1983); *Bilyk v. Chicago Transit Authority,* 531 N.E.2d 1, 7, 125 Ill.2d 230, 125 Ill.Dec. 822, 828 (Ill.1988); Ind.Code Ann. § 34–4–4–1 (Burns 1973 & Supp. 1984); Md.Cts. & Jud.Proc.Code Ann. § 5–301 (1980); *Gasper v. Lighthouse, Inc.,* 533 A.2d 1358, 73 Md.App. 367 (Md.App.1987); *Cotton v. Kambly,* 300 N.W.2d 627, 628, 101 Mich.App. 537 (Mich.App.1980); Mich.Comp.Laws Ann. § 600.2901 (West 1968); Minn.Stat.Ann. § 553.02 (West Supp.1984); *Larson v. Dunn,* 449 N.W.2d 751, 756 (Minn.App.1990); Mont.Code Ann. § 27–1–601 (1983); Nev.Rev.Stat. § 41.380 (1979); *Feldman v. Feldman,* 480 A.2d 34, 125 N.H. 102 (1984); *Zaragoza v. Capriola,* 492 A.2d 698, 201 N.J.Super. 55 (1985); N.J.Stat.Ann. § 2A:23–1 (West 1952); N.Y. Civ. Rights Law § 80–a (McKinney 1976); Ohio Rev.Code Ann. § 2305.29 (Page 1981); *Hardy v. VerMeulen,* 512 N.E.2d 626, 628, 32 Ohio St.3d 45 (1987); Okla. Stat.Ann. tit. 76, § 8.1 (West Supp.1983–1984); Or.Rev.Stat. § 30.850 (1983); *Com. v. Shoemaker,* 518 A.2d 591, 595, 359 Pa.Super. 111, 118

Following the trend observed by commentators and the courts, we thus hold that the action for intentional interference with the marital relation is abolished. As the Washington Supreme Court observed:

the harm engendered [is] far outweighed [by] any reason for [the tort's] continuance. *Wyman, supra,* 615 P.2d at 455.

Such suits invite abuse. Because courts cannot properly police settlements, these actions are "often characterized by the plaintiff-spouse blackmailing the defendant into a high priced settlement with the threat of a lawsuit that could destroy the defendant's reputation." *O'Neil v. Schuckardt, supra,* 733 P.2d at 697. Frequently the end result of these cases is essentially the plaintiff's sale of his spouse's affections. *Id., Wyman v. Wallace, supra.* Not only is a defendant in these suits victim to vindictive or purely mercenary motives of the plaintiff, but such suits are likely to expose "minor children of the marriage to one of [their] parent's extramarital activities, and may even require the children to testify to details of the family relationship in open court." *O'Neil v. Schuckardt, supra,* 733 P.2d at 698; Note, *The Suit of Alienation of Affections: Can Its Existence Be Justified Today?* 56 N.D.L.Rev. 239, 254 (1980).

This opinion in no way affects the right to recover for loss of consortium as a factor in assessing damages when underlying liability has been established in a personal injury suit. Rather we move to eliminate the right to recover for intentional interference with the marital relation because it proceeds from a belief that a spouse owns the affections of his marital partner which provides no basis for liability. *Fundermann, supra,* at 794.

We therefore rule to abolish the action known as tortious interference with the marital relation, relying on the premise that affection between spouses cannot be owned, *id.,* i.e., that the underlying assumption of the tort is an anachronism.

(1986); *Pickering v. Pickering,* 434 N.W.2d 758, 763 (S.D.1989); Tex.Fam.Code Ann. § 4.05 (Supp.1984); *Lucas v. U.S.,* 757 S.W.2d 687, 711 (Tex.1988); Vt.Stat.Ann. tit. 15, § 1001 (Supp.

Thus the opinion of the Court of Appeals which affirmed the trial court decision is hereby reversed.

All concur.

1984); Va.Code § 8.01–220 (1984); *Lund v. Caple,* 675 P.2d 226, 100 Wash.2d 739 (1984); *Brown v. Thomas,* 379 N.W.2d 868, 127 Wis.2d 318 (1985); and Wyo.Stat. § 1–23–101 (1977).