**John LARSON, individually and John Larson, as the father and natural guardian of Jessica Larson, a minor, Respondents,**

v.

**Loree Carol DUNN, a/k/a Jennifer Dunn, J.T. Thompson, Ione Thompson, Carlin Olson, Rick Olson, Inga Rigenhagen, and John Does I–X, Respondents,**

and

**Franklin Rigenhagen and Carol Rigenhagen, Appellants.**

**No. C7-89-1139.**

Supreme Court of Minnesota.

Aug. 31, 1990.

---

James R. Carlson, Muir, Heuel, Carlson & Spellhaug, P.A., Rochester, for appellants.

Terry W. Viesselman, Wilhelm & Associates, Fairmont, for John Larson, et al.

Steven R. Sunde, St. James, for Rick Olson.

KEITH, Justice.

John Larson (Larson) sued his former wife, Loree Dunn (Dunn), her father and mother, Franklin Rigenhagen and Carol Rigenhagen (Rigenhagens), and several other relatives for alleged intentional interference with his custodial rights to his minor daughter, Jessica. The trial court, *inter alia,* denied a motion to dismiss for lack of personal jurisdiction over the nonresident Rigenhagens and granted a motion to dismiss for failure to state a claim. The Minnesota Court of Appeals affirmed the jurisdictional ruling but reversed the trial court and recognized the custodial interference tort. *Larson v. Dunn,* 449 N.W.2d 751, 760 (Minn.App.1990). We affirm in part and reverse in part.

I.

John Larson and Loree Rigenhagen were married on February 11, 1978 and their daughter, Jessica, was born on July 25, 1978. In February of 1980, Dunn commenced an action to dissolve the marriage and she was given temporary physical custody of Jessica. On November 5, 1980, their marriage was dissolved and Larson was awarded permanent physical custody of Jessica. Dunn did not appeal this decision. Larson alleged that he was denied access to Jessica by Dunn's father, Franklin Rigenhagen, the evening of November 5, 1980 and when he went to the Rigenhagens' home the following day with a copy of the court order, he was told Dunn had fled the state with Jessica. Larson then commenced a seven year search for Jessica which included efforts by local law enforcement authorities as well as the FBI. In addition an arrest warrant was issued for Dunn for felony deprivation of parental rights (Minn.Stat. § 609.26 (1988)).

Based on information from the F.B.I. indicating Dunn's relatives might have information about her and Jessica's whereabouts, Larson filed suit in U.S. District Court for the District of Minnesota on June 3, 1985 against Dunn, the Rigenhagens, and J.T. and Ione Thompson (Loree Dunn's aunt and uncle), alleging their actions constituted negligence, conspiracy, kidnapping, fraud and interference with parental custodial rights. Larson dismissed the action without prejudice before trial because of the Rigenhagens' denials to the complaint and because of information that the F.B.I. would not testify during an ongoing investigation.

In August 1987, the F.B.I. located Dunn and Jessica in the State of Washington, where they were living with Dunn's second husband, Paul Dunn, whom she married in December 1983. Dunn pled guilty to the kidnapping charge on September 16, 1987. She claims she left Minnesota in 1980 upon her attorney's advice while the temporary custody order was still valid and that she did not learn until 30 days later that Larson was awarded physical custody. Dunn signed affidavits in August 1987 contending Larson physically abused her and Jessica, and sexually abused Jessica. She further claims Larson denied her visitation rights after he regained custody of Jessica in 1987.

Since her return in 1987, Jessica has been in Larson's custody. Larson learned from Jessica that the Rigenhagens, Rick Olson (Jessica's uncle) and other relatives had contact with her and his former wife during their seven year absence. Paul Dunn provided similar information in a 1989 affidavit. In a 1981 article in a local Minnesota newspaper and in their answer to the original complaint, however, the Rigenhagens denied knowledge of the whereabouts of their daughter and grandchild. Olson, in answer to interrogatories, admitted seeing Dunn and Jessica in California with the Rigenhagens in "either 1983 or 1984." He also asserted the Rigenhagens had contact with Jessica and Dunn between 1980 and 1987. Larson also claims the Rigenhagens and Olson denied having information concerning the whereabouts of Loree and Jessica to local law enforcement authorities and the F.B.I. Olson counters that he made his denial prior to his visit with Loree and Jessica in 1983 or 1984.

Larson filed suit in Martin County District Court on January 4, 1989 against Dunn, the Rigenhagens and Rick Olson,[1] alleging their actions constituted intentional interference with parental custodial or visitation rights, civil conspiracy, intentional infliction of emotional distress, and fraud. Larson claims damages of over $50,000 in search related costs, emotional distress and loss of Jessica's companionship and society; damages are also claimed on behalf of Jessica for loss of her father's companionship during her abduction. Although Dunn was properly served in Washington, she refused service and did not appear. Her only response was a letter to Larson and his attorney indicating she acted alone and was advised she was not liable for expenses Larson incurred in the search.

On December 19, 1988, the Rigenhagens moved to stay proceedings under Minn.R. Civ.P. 41.04 (costs of previously dismissed action); to dismiss for lack of personal jurisdiction; to dismiss for failure to state a cause of action under Minn.R.Civ.P. 12.-03; and to stay discovery under Minn.R. Civ.P. 26.03. Olson moved on December 22, 1988, to dismiss for failure to state a cause of action and for summary judgment. By order dated February 17, 1989, the trial court denied the motions to stay proceedings, to dismiss for lack of jurisdiction, and for summary judgment, but granted the motions to stay discovery and to dismiss for failure to state a claim. The parties appealed.[2]

The court of appeals affirmed the trial court on all issues except the motion to dismiss the intentional interference tort. *Larson*, 449 N.W.2d at 760. This court granted the Rigenhagens' petition for further review. They did not appeal the stay issues.

## II.

■ The Rigenhagens lived in Minnesota in 1980 when the alleged tort occurred, but have been living in California since 1982. We believe the trial court and the appellate court correctly denied their motion to dismiss for lack of jurisdiction.

---

1. The other named parties were not served and have not appeared. Apparently, Inga Rigenhagen is deceased and the whereabouts of the other parties is unknown.

2. The first appeal attempt failed since the trial court's order dismissed only the Rigenhagens and Olson, and other parties to the complaint remained. The parties then stipulated to entry of final judgment for purposes of perfecting an appeal, and it was so ordered on May 25, 1989. At the same time, Larson withdrew his motion for default judgment against Dunn.

■ Personal jurisdiction is properly exercised if the nonresident's contacts satisfy our long-arm statute and constitutional concerns. *Sherburne County Social Servs. v. Kennedy,* 426 N.W.2d 866, 867 (Minn.1988). Larson bears the burden of proving sufficient forum contacts exist when jurisdiction is challenged. *Hardrives, Inc. v. City of LaCrosse,* 307 Minn. 290, 293, 240 N.W.2d 814, 816 (1976).

Under Minnesota's long-arm statute, Minn.Stat. § 543.19, subd. 1 (1988), personal jurisdiction may be exercised over a nonresident who:

(a) Owns, uses, or possesses any real or personal property situated in this state, or

\* \* \* \* \* \*

(c) Commits any act in Minnesota causing injury or property damage, or

(d) Commits any act outside Minnesota causing injury or property damage in Minnesota, subject to the following exceptions when no jurisdiction shall be found:

(1) Minnesota has no substantial interest in providing a forum; or

(2) the burden placed on the defendant by being brought under the state's jurisdiction would violate fairness and substantial justice; or

(3) the cause of action lies in defamation or privacy.

■ Larson alleges that while still in Minnesota, the Rigenhagens aided in the abduction and concealment of Jessica. The Rigenhagens allege that their daughter asserts she acted alone. Larson's allegations, however, must be viewed as true for purposes of determining whether he has made a prima facie showing of personal jurisdiction. *Hunt v. Nevada State Bank,* 285 Minn. 77, 82, 172 N.W.2d 292, 296–97 (1969), *cert. denied,* 397 U.S. 1010, 90 S.Ct. 1239, 25 L.Ed.2d 423 (1970). Thus, personal jurisdiction may be properly asserted over the Rigenhagens since the alleged cause of action arose in Minnesota.

■ The Rigenhagens contend this basis for long-arm jurisdiction is improper because the statute of limitations has run on any acts committed while they were Minnesota residents. The *Larson* panel found this argument meritless, noting "[a]lthough some interplay exists between these two legal doctrines \* \* \*, whether a claim is time barred is an issue separate from the issue of personal jurisdiction." 449 N.W.2d at 759. We agree. Further, because "fraudulent concealment of th[e] cause of action will prevent the running of the statute of limitations," *Kopperud v. Agers,* 312 N.W.2d 443, 446 (Minn.1981); *see also* Minn.Stat. § 541.05, subd. 1(6) (1988) (fraud action does not accrue until discovered), the statute of limitations had not run when suit was filed January 4, 1989. *See* Minn.Stat. § 541.07(1) (1988) (two year limitation period).

■ Personal jurisdiction also is proper since the Rigenhagens' allegedly tortious conduct continued after they moved to California. *See* Minn.Stat. § 543.19, subd. 1(d) (out-state act causing in-state injury). The United States Supreme Court held that personal jurisdiction properly could be exercised over nonresident media when the effects of their intentional conduct were felt in the forum state. *Calder v. Jones,* 465 U.S. 783, 787 n. 6 & 790, 104 S.Ct. 1482, 1485 n. 6 & 1487, 79 L.Ed.2d 804 (1984) (construing California's long-arm statute). The Rigenhagens' alleged acts were at least indirectly aimed at depriving Larson of his custody rights and the effects of these acts clearly harmed Larson in Minnesota.

■ Due process requires the nonresident defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (citation omitted). In analyzing these constitutional parameters, we

examine five factors: (1) the quantity of contacts with the state, (2) the nature and quality of those contacts, (3) the connection or relationship between the contacts and the cause of action, (4) the state's interest in providing a forum, and

(5) the relative convenience of the parties. Factors (4) and (5) are considered secondary.

*Kennedy,* 426 N.W.2d at 868 (citation omitted). Under this analysis, the nonresident's contacts must be "such that he should reasonably anticipate being haled into court there." *Kennedy,* 426 N.W.2d at 870 (citation omitted); *see also Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958) (purposeful availment); *West Am. Ins. Co. v. Westin, Inc.,* 337 N.W.2d 676, 679 (Minn.1983).

In a similar context, personal jurisdiction was challenged in an action by a father against his nonresident former in-laws for allegedly conspiring to intentionally deprive him of custody. *Stangel v. Rucker,* 398 N.W.2d 602, 604 (Minn.App.1986), *pet. for rev. denied* (Minn., March 13 & 25, 1987; June 29, 1988). The panel there held the following forum contacts by the nonresidents were insufficient: paying legal fees to a Minnesota firm in connection with the dissolution proceeding; providing care for the minor child after they knew he had been abducted; and lying about the child's whereabouts in a phone conversation initiated by the father. *Id.* at 605–06. The forum contacts here, however, present a stronger case for finding personal jurisdiction.

The Rigenhagens allegedly denied Larson access to Jessica in 1980 and aided in Jessica's abduction and concealment during the two years they remained Minnesota residents. Franklin Rigenhagen maintained a post office box in Minnesota after moving to California, by which he offered to act as a "go between" for Larson and his daughter. These direct contacts actually gave rise to the cause of action and are such that the Rigenhagens reasonably could have expected to be haled into court here. Further, the Rigenhagens owned real property in Minnesota until March 1985, when they conveyed it into a trust and they apparently remain trustees of this property. They also owned and operated a car dealership in Minnesota until 1984. Although these property contacts are unrelated, they indicate the Rigenhagen's purposeful availment of Minnesota privileges.

Minnesota has an interest in providing a forum for this dispute. The subject custody order was issued by a Minnesota court, over which Minnesota retains continuing jurisdiction under the Uniform Child Custody Jurisdiction Act (UCCJA). Minn.Stat. § 518A.03, subd. 1(a)(2) (1988). Minnesota also is interested in protecting the custodial rights of its citizens. *See* Minn.Stat. §§ 518A.01, subd. 1(b) & 518A.02(e) (1988) (UCCJA provisions designed to deter abductions and preventing forum shopping). The parties are residents of Minnesota, California and Washington, and these states likely will be the site of witnesses and evidence. While Minnesota may not be the only appropriate forum, we hold the Rigenhagens had sufficient minimum contacts with this state such that our exercise of personal jurisdiction over them does not offend constitutional due process nor statutory requirements.

### III.

The crucial issue for this court is whether to create a tort of "intentional interference with custodial rights." The trend in the past years has been toward recognizing this tort. Approximately one third of the state appellate courts have ruled on this issue.[3] Despite what other

---

**3.** Twenty-one jurisdictions have ruled on this issue. Of these rulings, only eleven are decisions of state supreme courts. *D & D Fuller CATV Const. v. Pace,* 780 P.2d 520 (Colo.1989); *Shields v. Martin,* 109 Idaho 132, 706 P.2d 21 (Idaho 1985); *Wood v. Wood,* 338 N.W.2d 123 (Iowa 1983); *Plante v. Engel,* 124 N.H. 213, 469 A.2d 1299 (1983); *McBride v. Magnuson,* 282 Or. 433, 578 P.2d 1259 (1978); *Bedard v. Notre Dame Hospital,* 89 R.I. 195, 151 A.2d 690 (1959); *Brown v. Brown,* 338 Mich. 492, 61 N.W.2d 656 (1953) (cert. denied); *Montgomery v. Crum,* 199 Ind. 660, 161 N.E. 251 (1928) (by implication); *Howell v. Howell,* 162 N.C. 283, 78 S.E. 222 (1913); *Clark v. Bayer,* 32 Ohio St. 299 (1877); *Silcott v. Oglesby,* 721 S.W.2d 290 (Tex.1986) (stepfather sued maternal grandfather; court applied Restatement § 700 tort).

Six are decisions of state appeals courts. *Surina v. Lucey,* 168 Cal.App.3d 539, 214 Cal.Rptr. 509 (1985); *In re Marriage of Hall,* 25 Wash.App. 530, 607 P.2d 898 (1980); *Spencer v. Terebelo,* 373 So.2d 200 (La.Ct.App.1979) cert. denied, 376

jurisdictions have decided, this court must base its decision on what is the best public policy for the State of Minnesota.

Having witnessed a steady increase in family law litigation over the past 25 years, our courts and the legislature have learned that we must carefully consider, in disputes over children, not only the rights of parents but more importantly, the welfare and best interests of their children. *Berndt v. Berndt,* 292 N.W.2d 1 (Minn.1980); *LaBelle v. LaBelle,* 296 Minn. 173, 207 N.W.2d 291 (1973); *State v. Waslie,* 277 Minn. 446, 152 N.W.2d 755 (1967); Minn. Stat. § 257.025 (1988). *See* Chambers, *Rethinking the Substantive Rules for Custody Disputes in Divorce,* 83 Mich.L. Rev. 477, 481 n. 7 (1984).

In deciding whether to create this tort (which is derivative of custodial rights), we must take the interests of the children involved as an important policy consideration. *Cf. Wood v. Wood,* 338 N.W.2d at 128 (Wolle, J. dissenting). This new tort would create a new burden on children who are already dislocated by the dissolution of their parents' marriage. Abducted children are almost always young. The abductors are often the noncustodial parent (as in this case, the mother, in many cases, the father) assisted by immediate family or relatives. Children of divorce generally love their parents and want a loving and helpful relationship with both parents once the marriage is dissolved. With this tort, a child may be forced to testify against his or her own mother or father. In this case, the father submitted an affidavit from Jessica relating to the actions of her mother and grandparents. One can only imagine the torment of a young child forced to testify in writing or verbally against a parent he or she loves. Jessica had lived with her mother for over 8 years before she was returned to her father.

Evidence is piling up that children can be devastated by divorce, and their continuing development can be detrimentally affected by subsequent events. *See, e.g.,* Chambers, 83 Mich.L.Rev. at 507 (noting that divorce is a time of anxiety and dislocation); Schepard, *Taking Children Seriously: Promoting Cooperative Custody after Divorce,* 64 Tex.L.Rev. 687, 703–04 (1985) (divorce causes "significant and threatening instability in a child's life" causing emotional damage).

For the good of our children, the law should seek to promote such harmony as is possible in families fractured by the disso-

So.2d 960 (La.1979); *Mathews v. Murray,* 101 Ga.App. 216, 113 S.E.2d 232 (1960) ("by implication"); *Armstrong v. McDonald,* 39 Ala.App. 485, 103 So.2d 818 (1958).

Of the eleven state supreme court cases, at least one recognized the tort only "by implication." *Montgomery v. Crum,* 199 Ind. 660, 161 N.E. 251 (1928); *cf. also Shields v. Martin* (addressing joint liability of police officer and mother for abduction; basically *assuming* that abduction was tort under state law); *Mathews v. Murray,* 101 Ga.App. 216, 113 S.E.2d 232 (1960) ("by implication"); *In re Marriage of Hall,* 25 Wash.App. 530, 607 P.2d 898 (1980) (Tort has been "discussed in Washington cases * * * and recognized elsewhere * * *.").

Several state cases concerned unrelated third parties; a suit against a third party surely does not threaten the child's well-being to the degree that an intra-family suit would. *McBride v. Magnuson,* 578 P.2d at 1259 (Or.) (*did not involve parental kidnapping;* rather involved a police officer); *Bedard v. Notre Dame Hosp.,* 151 A.2d at 690 (RI) (*did not involve parental kidnapping;* rather a hospital's refusal to discharge infant); *Armstrong v. McDonald,* 39 Ala.App. 485, 103 So.2d 818 (1958) (third parties induced child to leave mother; no relatives involved).

The remainder of the cases were federal court cases, which attempt to predict how the state supreme court will rule.

Three jurisdictions have either deferred consideration or declined to create the tort. *See McDougald v. Jenson,* 596 F.Supp. 680 (N.D.Fla. 1984), *aff'd,* 786 F.2d 1465 (11th Cir.1986); *Bartanus v. Lis,* 332 Pa.Super. 48, 480 A.2d 1178 (1984); *Schuppin v. Unification Church,* 435 F.Supp. 603 (D.Vt.1977); *but cf. Sheltra v. Smith,* 136 Vt. 472, 392 A.2d 431 (1978) (holding parental child abduction compensable under intentional infliction of emotional distress). Also, in Illinois, the state court of appeals decided not to create the tort, but the district court for the Northern District of Illinois "overrode" this decision. *Whitehorse v. Critchfield,* 144 Ill.App.3d 192, 98 Ill.Dec. 621, 623, 494 N.E.2d 743, 745 (1986) (stating that, because of possible multiplicity of lawsuits resulting, civil sanctions for custodial interference best left to legislature); *but see Kunz v. Deitch,* 660 F.Supp. 679, 683 (N.D.Ill.1987) (applying Illinois law and declining to follow *Whitehorse* ). The decision in Iowa was deeply divided with a strong and well-reasoned dissent. *Wood v. Wood,* 338 N.W.2d 123, 128 (Iowa 1983) (Wolle, J., joined by Harris and McGiverin, JJ., dissenting).

lution process. At a minimum, the law should not provide a means of escalating intrafamily warfare. This action puts members of Jessica's family—her mother, grandparents, her uncle at odds with her father, and places her in the middle.

It is clear that this tort would be used as a new weapon in such disputes. Already this litigation has precipitated bitter accusations and contradictory affidavits. The interest in compensation should not outweigh the effects of bitter accusations on young children. This court, in denying a cause of action for alienation of a child's affection after our legislature had abolished this action, reasoned that

> [t]he circumstances under which the right has here been asserted demonstrate the potential for grave abuses, in which a child becomes the object of intrafamily controversy and, indeed, a pawn in disputes over monetary matters. In the more usual case of marriage dissolution resulting in deteriorated relationships, a cause of action by one parent against another for alienation of a child's affections would exacerbate the unhappy relationships and become a strategic tool for advantageous use of one family member over another.

*Bock v. Lindquist*, 278 N.W.2d 326, 327–28 (Minn.1979).

Creating this new tort would *create* a new wrong. It would place innocent children in the middle of a vigorous, probably vicious, lawsuit between their parents. It would duplicate the ambivalence and dislocation of the dissolution itself. In this case the grandparents would defend themselves on the grounds that they reasonably believed their grandchild was abused and this would in effect cause relitigation of the original critical custody decision made in 1980.

The law in Minnesota already provides redress for a custodial parent in such a situation. Minn.Stat. § 611A.04. This provision does not allow jury trial. It may be that, in this sensitive area of family law, a judge's discretion is better than a jury trial, at which a child would almost certainly have to testify. In any event, this would prevent *additional* litigation, which would place a burden of stress on the abducted child. In addition, our parental kidnapping statute may provide for an award of costs incurred in recovering the child. Minn. Stat. § 609.26, subd. 4 (1988).

Further, emotional distress could possibly be recovered in egregious cases through the independent tort of Intentional Infliction of Emotional Distress, which Minnesota recognizes. *See Hubbard v. United Press International*, 330 N.W.2d 428, 439–39 (Minn.1983) (recognizing IIED). Minnesota already recognizes the action for lost services of the child. *See Eichten v. Central Minnesota Cooperative Power Ass'n*, 224 Minn. 180, 194–95, 28 N.W.2d 862, 871 (1947).

Although the conduct in this case is egregious, and done in defiance of a court order, the proper remedy for such violation of the court's integrity lies in contempt and other such sanctions; not in providing the other party with compensation. *Cf. Bock v. Lindquist*, 278 N.W.2d 326, 328 (Minn. 1979) (denying parent tort recovery for alienation of child's affection, in part because other remedies make actions for alienation unnecessary and undesirable, e.g., habeas corpus, or contempt of court). This case also clearly illustrates the other penalties abductors will pay. The mother in this case has not seen her daughter since she was apprehended over three years ago.

This tort will not deter parental abduction. The mother and grandparents in this case apparently believed they were protecting the child. A growing number of parents are hiding their children to protect them from physical and sexual abuse. *See* Myers, *Allegations of Child Sexual Abuse in Custody and Visitation Litigation: Recommendations for Improved Fact Finding and Child Protection*, 28 J.Fam.L. 1, 2 (1989). Studies show that allegations of sexual abuse, while sometimes fabricated, are very often genuine. *Id.* at 21. Family ties are normally stronger than the fear of money damages. If a parent or grandparent believes a child is in danger, that parent or grandparent will probably not stop to consider tort liability

before acting to protect the child. It will not add to the dignity of the law if grandparents are sued for providing shelter to their grandchildren in such situations.

The scope of liability under this new tort may also result in a proliferation of litigation. Liability under the tort is contemplated not only for physically taking the child but for such conduct as "providing the means by which the child was carried off." Prosser & Keeton on the Law of Torts, § 124, text at note 32. Larson not only alleges certain affirmative acts by the grandparents and uncle but also alleges their failure to give correct information about Jessica's whereabouts, thereby delaying her discovery and aggravating his emotional and financial harm. Once we adopt the rule contemplated by the Restatement, it soon will become an integral part of Minnesota family law. Such a tort could be used as a weapon for revenge and continued hostility as is clearly apparent in this case.

 The Minnesota Legislature has dealt intelligently with this problem. Child abduction by the noncustodial parent is a serious crime.[4] The state has also adopted the Uniform Child Custody Jurisdiction Act (UCCJA) which provides a means for enforcing custody decrees across state lines. In addition our courts have broad discretion to protect custodial and visitation rights. Minn.Stat. § 518.175, subd. 3 (custodial parent may not move child out of state if intent is to interfere with visitation rights) and subd. 4 (contempt of court for unwarranted denial or interference with visitation rights) (1988) id. at 518.176 (judicial supervision of custody and visitation rights). See *Tischendorf v. Tischendorf,* 321 N.W.2d 405, 412 (Minn.1982) (approving requirement that noncustodial parent post bond and provide transportation for adult companion to secure return of child to custodial parent after foreign visits),

cert. denied, 460 U.S. 1037, 103 S.Ct. 1426, 75 L.Ed.2d 787 (1983).

It has been advocated by some that this tort will "fill in the gaps." Before taking such a step, which may profoundly and permanently affect the relationships between children, their parents, grandparents, aunts and uncles, a broader segment of our society should study, debate and consider this action, and if such a tort is to be adopted, decide how broad its scope and how far reaching its award of damages will be.

Expanding the adversarial process to include this new tort is contrary to the best interests of children and will only intensify intrafamily conflict growing out of marriage dissolution without deterring parental abduction.

Affirmed in part, reversed in part.

POPOVICH, Chief Justice (dissenting).

I concur with the majority on the issue of personal jurisdiction. I respectfully dissent on the issue of an action for interference with custodial rights and would affirm the court of appeals. The majority's emphasis on limited aspects of the case ignores those facets involving elemental fairness and honoring a custodial order.

*Public Policy:*

In analyzing the important public policies raised by this case, we should consider, *inter alia,* the following factors: a.) respect for unappealed court orders regarding custody; b.) a recognized need for compensation; c.) historical developments in related tort law; d.) the moral aspects of the defendant's conduct; and e.) the prevention and punishment aspects of liability. *See* W. Prosser & W. Keeton, *Prosser & Keeton on the Law of Torts* § 4, at 20–26 (5th ed.1984). Larson was deprived of his parental rights for seven years in clear violation of the custody decree. Similarly, Jessica was denied the right to a relationship

---

**4.** Child abduction by the noncustodial parent is a felony in Minnesota. Minn.Stat. § 609.26. As the court of appeals pointed out, a criminal statute does not automatically give rise to a civil cause of action unless the statute expressly or by clear implication so provides. *See, e.g., Nem-* *ec v. Brown,* 150 Minn. 252, 184 N.W. 956 (1921); *Miller v. Minneapolis Underwriters Ass'n,* 226 Minn. 367, 33 N.W.2d 48 (1948). Minnesota Statutes section 609.26 does not explicitly or implicitly authorize a civil cause of action.

with her father during a critical stage in her development. Although this precious lost time can never be regained, some form of redress undoubtedly is in order.

Tort law long has protected "relational" interests, such as between family members, from interference. Prosser & Keeton, *supra*, § 124, at 915; *see, e.g., In re Parks*, 267 Minn. 468, 127 N.W.2d 548 (1964); *Miller v. Monsen*, 228 Minn. 400, 37 N.W.2d 543 (1949) (holding child could bring action for enticement of parent). In 1978, however, our legislature abolished alienation of affection and other "heart balm" actions because they "have been subject to grave abuses." Act of March 23, 1978, ch. 515, §§ 1, 2, 1978 Minn.Laws 141, 141, *codified at* Minn.Stat. §§ 553.01; 553.02 (1988); *see Bock v. Lindquist*, 278 N.W.2d 326, 327 (Minn.1979) (refusing to recognize a cause of action by a parent against relatives for alienation of a child's affections). These limitations are distinguishable because, with the custody tort, "the interference with family relations is accomplished by means of some independent tort, such as fraud * * *." Prosser & Keeton, *supra*, § 124, at 930; *see* Restatement (Second) of Torts § 699 (1977) ("Restatement") (parent has no action for *mere* alienation of child's affections). Indeed, Larson also pleaded fraud as a cause of action and, in support of the interference action, claims the Rigenhagens and Olson gave fraudulent information to authorities and in court documents.

This litigation has precipitated bitter accusations and contradictory affidavits. Unfortunately, such personal disputes are common today and the parent-child relationship is increasingly threatened by family members. *Cf. Anderson v. Stream*, 295 N.W.2d 595, 601 (Minn.1980) (abolishing parent-child immunity). Child abduction has become a recurring scenario on the family law landscape, and such situations, where the parties' actions are motivated by runaway emotions, have evolved into a disturbing social trend. Indeed, about 100,000 to 750,000 parental child kidnappings occur each year, and the abducting parent often is aided by relatives and friends. *Larson*, 449 N.W.2d at 754 (citing authority). The

Rigenhagens argue tort liability will have little deterrent effect where, as here, the alleged interferers believe their actions were "morally right." Loree Dunn, however, neither appealed the custody order nor petitioned for a change of custody, as is required once custody has been established, *Morey v. Peppin*, 375 N.W.2d 19, 25 (Minn.1985), but instead fled the state with Jessica. The custody decree vests the custodial parent with certain rights, including the right to determine the child's upbringing, education, health care, and religious training. Minn.Stat. §§ 518.003, subd. 3(a); 518.176, subd. 1 (1988). These rights should be legally protected against intentional interference. *See* Minn. Const. art. 1, § 8 (everyone entitled to remedy for wrongs to "person, property or character"). No party is above the law and resort to such self-help measures is not justified.

As the majority notes, the legal system may not be the best arena to settle personal, family disputes. Yet, the familial relationships were already wounded by the divorce and kidnapping before this action was brought. Depriving the victimized parent of a forum for redress, then, will not necessarily promote the family's healing. Further, a parent's right to custody has been likened to a constitutional inalienable right. *State v. Whaley*, 246 Minn. 535, 547–48, 75 N.W.2d 786, 794 (1956). Not only is the conduct alleged in violation of this right particularly egregious, but it was done in arrogant defiance of the sanctity of court orders. The majority does not indicate how best interests of the child are served by condoning this type of activity.

State legislatures have responded to this crisis by enacting the UCCJ, designed to prevent kidnapping aimed at forum shopping in hopes of gaining custody of the child. *See* Minn.Stat. § 518A.01 (1988). Redress also has been initiated at the federal level. *See* Parental Kidnapping Prevention Act of 1980, Pub.L. No. 96–611, 94 Stat. 3566 (codified in scattered sections of 18, 28 & 42 U.S.C.); 18 U.S.C.A. § 1073 (West 1976 & Supp.1989) (criminal penalty for parental kidnapping). Under Minnesota's current criminal code, to which Dunn

apparently pleaded guilty, it is a felony to intentionally deprive another of custodial or parental rights. Minn.Stat. § 609.26 (1988 & Supp.1989). The statute, however, only provides for a discretionary award of costs incurred in recovering the child and does not allow compensation for other damages resulting from the kidnapping. *Id.* at subd. 4. This court, however, is in a position to fill the gaps left by the laws in this area. *See* Prosser & Keeton, *supra,* § 3, at 19.

The judiciary has broad discretion to protect custodial and visitation rights. *See* Minn.Stat. § 518.175, subd. 3 (custodial parent may not move child out-state if intent is to interfere with visitation rights) & subd. 4 (contempt of court for unwarranted denial of or interference with visitation rights) (1988); *id.* at § 518.176 (judicial supervision of custody and visitation terms); *see, e.g., Tischendorf v. Tischendorf,* 321 N.W.2d 405, 412 (Minn.1982) (approving requirement that noncustodial parent post bond and provide transportation for adult companion to secure return of child to custodial parent after foreign visits), *cert. denied,* 460 U.S. 1037, 103 S.Ct. 1426, 75 L.Ed.2d 787 (1983). By limiting the frequency and circumstances under which custodial modification may be made, the legislature acknowledges the importance of maintaining a consistent and stable custody situation. *See* Minn.Stat. § 518.18 (1988). The fact that alienation of affection actions are not viable does not "diminish[ ] other remedies for interference with familial relationships * * *." *Bock,* 278 N.W.2d at 328. Indeed, liability for custodial interference appears to be the national trend. *Larson,* 449

N.W.2d at 755 n. 3 & 4.[1] The unifying thread running through these cases is the tacit recognition that a parent has an enforceable interest in the care and custody of a minor child.

*Scope of Liability:*

Section 700 of the Restatement delineates the parameters of the custody tort:

> One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent.

Restatement (Second) of Torts § 700 (1977); *see, e.g., Larson,* 449 N.W.2d at 756; *see generally* Prosser & Keeton, *supra* at 925. Because parents generally have an equal right of access to their children, maintenance of an interference action has been limited to parents entitled to sole physical custody under a court decree, as Larson is. *See* Restatement § 700 comment c.

To be actionable, the alleged conduct must be intentional, that is, the interference must be done with knowledge, as the Rigenhagens admit, "that the child is away from home against the will of the parent." Restatement § 700 comment b; *but see Shields v. Martin,* 109 Idaho 132, 139–41, 706 P.2d 21, 29 (1985) (civil rights action allowed on negligence theory against police officer for aiding in child's abduction). Of course, any consent by the child is immaterial. Restatement § 700 comment a. Because knowledge of the lack of parental consent is the focus, the actor's "motive or

1. *See, e.g., DiRuggiero v. Rodgers,* 743 F.2d 1009 (3d Cir.1984) (applying New Jersey law); *Wasserman v. Wasserman,* 671 F.2d 832 (4th Cir. 1982) (applying Maryland law), *cert. denied,* 459 U.S. 1014, 103 S.Ct. 372, 74 L.Ed.2d 507 (1982); *Fenslage v. Dawkins,* 629 F.2d 1107 (5th Cir. 1980) (applying Texas law); *Kunz v. Deitch,* 660 F.Supp. 679 (N.D.Ill.1987) (applying Illinois law); *Lloyd v. Loeffler,* 539 F.Supp. 998 (E.D. Wis.1982), *aff'd,* 694 F.2d 489 (7th Cir.1982) (applying Wisconsin law); *Kajtazi v. Kajtazi,* 488 F.Supp. 15 (E.D.N.Y.1978) (applying New York law); *D & D Fuller CATV Const., Inc. v. Pace,* 780 P.2d 520 (Colo.1989); *Surina v. Lucey,* 168 Cal.App.3d 539, 214 Cal.Rptr. 509 (1985); *Shields v. Martin,* 109 Idaho 132, 706 P.2d 21

(1985); *Wood v. Wood,* 338 N.W.2d 123 (Iowa 1983); *Plante v. Engel,* 124 N.H. 213, 469 A.2d 1299 (1983); *McBride v. Magnuson,* 282 Or. 433, 578 P.2d 1259 (1978); *Spencer v. Terebelo,* 373 So.2d 200 (La.Ct.App.1979), *writ denied,* 376 So.2d 960 (La.1979); *Mathews v. Murray,* 101 Ga.App. 216, 113 S.E.2d 232 (1960); *Bedard v. Notre Dame Hospital,* 89 R.I. 195, 151 A.2d 690 (1959); *Armstrong v. McDonald,* 39 Ala.App. 485, 103 So.2d 818 (1958); *Brown v. Brown,* 338 Mich. 492, 61 N.W.2d 656 (1953), *cert. denied,* 348 U.S. 816, 75 S.Ct. 27, 99 L.Ed. 644 (1954); *Montgomery v. Crum,* 199 Ind. 660, 161 N.E. 251 (1928) (by implication); *Howell v. Howell,* 162 N.C. 283, 78 S.E. 222 (1913); *Clark v. Bayer,* 32 Ohio St. 299 (1877).

purpose in preventing the child from returning home or inducing it not to return, is immaterial." *Id.* at comment b. Accordingly, the Rigenhagens' claims that they acted "out of love for their daughter and their granddaughter * * * [and] sought no gain nor sought to inflict damage on others" are irrelevant to the issue of whether Larson has established a prima facie case.

Under the Restatement, any actor with the requisite intent may be liable. *Cf.* Minn.Stat. § 609.26 (anyone who commits prohibited acts may be charged with kidnapping). Extended family members and even third parties have been held liable for assisting the noncustodial parent. *See, e.g., Lloyd,* 539 F.Supp. at 998 (grandparents); *McEvoy v. Helikson,* 277 Or. 781, 787, 562 P.2d 540, 543–44 (1977) (attorney). Liability is contemplated not only for physically taking the child, but for such conduct as "providing the means by which the child was carried off." Prosser & Keeton, *supra,* at 925. The key is how active the participation was. *Compare McEvoy,* 277 Or. at 787, 562 P.2d at 543–44 (attorney who wrongfully provided passports for escape liable), *with Finn v. Lipman,* 526 A.2d 1380, 1382–83 (Me.1987) (no contact with children and no affirmative acts alleged so attorney not liable).

In addition to the alleged affirmative acts of interference by the Rigenhagens, however, Larson also impliedly claims the Rigenhagens' and Olson's failure to give correct information about Jessica's and Loree's whereabouts delayed their recovery, aggravating his emotional and financial harm. Whether such conduct can give rise to liability is a more complicated issue. The *Larson* panel held:

Mere knowledge of the abduction scheme or of the location of the child and a failure to come forward is not enough to incur liability, absent some special status which would impose a duty on the defendant to come forward with the information. * * * A simple untruthful denial to police and others that the defendant knew where the child was is not enough to incur liability, nor is refusal to cooperate with an investigation necessarily ac-

tionable. A lie that goes beyond mere denial, however, may result in liability. 449 N.W.2d at 758.

The tort assumes a duty owed by third parties not to interfere with the custodial parent's rights vested by the custody decree. *See Larson,* 449 N.W.2d at 758; *Surina v. Lucey,* 168 Cal.App.3d 539, 543, 214 Cal.Rptr. 509, 512 (1985). This duty also has been implied through criminal parental kidnapping and abduction statutes. *E.g., Lloyd v. Loeffler,* 539 F.Supp. 998, 1004 (E.D.Wis.), *aff'd,* 694 F.2d 489 (7th Cir. 1982); *Spencer v. Terebelo,* 373 So.2d 200, 202 (La.Ct.App.1979); *see* Minn.Stat. § 609.26, subd. 7 (reporting duty for kidnapping); *but cf.* Minn.Stat. § 609.495, subd. 2 (1988) (prosecution for harboring felon exempted for relative of offender). Nonetheless, due to potential proof problems and policy concerns of foreseeability and notice, we should be reluctant to impose liability for mere failure to inform. Thus, Olson would not, without more, fall within this tort's ambit. Further discovery, however, may disclose a more active role on his part which could give rise to liability.

The Restatement posits two "privileges," whereby liability will not attach "for rescuing a child from physical violence inflicted by its parent * * * [and] inducing a child to leave its home for the purpose of marrying the actor." Restatement § 700 comments e & f; *cf.* Minn.Stat. § 609.26, subd. 2 (defenses to parental kidnapping include to protect "child from physical or sexual assault or substantial emotional harm"). The Rigenhagens claim they acted to protect their grandchild, believing Loree's claims that Larson physically and sexually abused Jessica. Whether this belief was reasonable and whether the actions were taken in good faith on behalf of the child would be issues for determination by the trier of fact.

*Damages:*

Larson claims he "has suffered severe mental anguish and suffering, the loss of the society and companionship of his daughter, and has incurred out-of-pocket expenses for locating and recovering the

custody of his daughter * * * in a sum in excess of $50,000." The complaint also alleges damages in excess of $50,000 for Jessica's loss of her father's companionship during their separation. Consistent with the Restatement, the *Larson* panel held the following types of damages to be recoverable under the custody tort: lost society, emotional distress, lost services, and expenses incurred in regaining custody and in treating the child for injuries resulting from defendant's tortious conduct. 449 N.W.2d at 757–58; Restatement § 700 comment g. Punitive damages also have been awarded under certain facts. *See, e.g., Kramer v. Leineweber,* 642 S.W.2d 364, 369–70 (Mo.App.1982) (conspiracy theory; punitive damages awarded); *Lloyd,* 539 F.Supp. at 1005 (punitive damages escalating monthly until child returned).

The financial harm suffered by the victimized parent is evidenced by the over $50,000 in costs Larson claims he expended during the seven year search for Jessica, including loss of time, travel expenses, attorney fees and private investigator fees. Although our parental kidnapping statute expresses the policy that such costs be born by the wrongdoer, Minn.Stat. § 609.26, subd. 4, this provision is discretionary and Larson's motion for such costs apparently was denied by the trial court in the criminal action. These expenses also are recoverable under the theory they were "incurred in the successful enforcement of a prior custody decree." *Larson,* 449 N.W.2d at 757. Thus, to the extent such costs have not been recovered under the statute, they should be available in a civil action.

Consortium damages include "[l]oss of love, care, society, companionship, and, in the case of a spouse, sexual relations[,]" as well as loss of services. *Salin v. Kloempken,* 322 N.W.2d 736, 738 (Minn. 1982). While not claimed here, the loss of a child's services is compensable under the Restatement, § 700 comment g, and generally under Minnesota case law. *See, e.g., Eichten v. Central Minnesota Coop. Power Ass'n,* 224 Minn. 180, 195, 28 N.W.2d 862, 871 (1947); 10 Minn.Dist. Judges Ass'n, *Minnesota Practice,* CIVILJIG 175

(2d ed. 1985). Loss of services, historically an essential element of consortium damages, however, is not required or is constructively found in an action where the child has been taken from the parents. Prosser & Keeton, *supra,* § 124, at 924–25; Restatement § 700 comment d.

We have expressly prohibited recovery by minor children for loss of parental consortium resulting from the negligence of third parties. *Salin,* 322 N.W.2d at 738 (negligently inflicted physical injuries to parents); *Plain v. Plain,* 307 Minn. 399, 403, 240 N.W.2d 330, 332 (1976) (mother negligently injures self); *Eschenbach v. Benjamin,* 195 Minn. 378, 379, 263 N.W. 154, 155 (1935) (negligently caused physical injuries to father). The sound policies underlying such a limitation, however, are inapplicable when the damages stem from intentional harm to the parent-child relationship. Even the *Salin* court was "keenly aware of the need of children for the love, society, companionship, and guidance of their parents; any injury that diminishes the ability of a parent to meet these needs is clearly a family tragedy and harms all members of that community." 322 N.W.2d at 742. Parents have similar rights flowing from the family relationship. Persuasive on this point is the earlier holding that a child may recover for enticement of its parent, just as the parent may bring such an action. *Miller,* 228 Minn. at 409, 37 N.W.2d at 548–49. Further support is found by analogy to employment and contractual relations which are protected from intentional interference. 228 Minn. at 411, 37 N.W.2d at 549. Surely, the interests of parent and child are as strong and the harm suffered from interference to their relationship as great as in these nonfamilial contexts. Common law consists "of broad and comprehensive principles based on justice, reason, and common sense * * * [that must adapt] as the progress of society may require." *Id.* at 406, 37 N.W.2d at 547. There is no reason to deny recovery for the loss of society and companionship resulting from such egregious and direct interference with the parent-child relationship in

flagrant violation of a court order as is alleged here.

As another component of damages, the custody tort contemplates recovery for emotional distress, as Larson alleges, stemming from the interference. Restatement § 700 comment g. Intentional infliction of emotional distress, however, also is recognized in Minnesota "as a separate and independent tort." *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438 (Minn. 1983). Larson pleads in the alternative that the Rigenhagens' and Olson's conduct constitutes the tort of intentional infliction of emotional distress. Emotional distress damages have been deemed recoverable under both the custodial interference tort and the intentional infliction tort. *See, e.g., Kunz,* 660 F.Supp. at 684 (emotional damages allowed; father denied contact with child for seven months); *Sheltra v. Smith,* 136 Vt. 472, 392 A.2d 431 (1978) (emotional distress claim allowed for one month denial); *Brown v. Brown,* 338 Mich. 492, 61 N.W.2d 656 (1953), *cert. denied,* 348 U.S. 816, 75 S.Ct. 27, 99 L.Ed. 644 (1954).

Generally, to recover damages for emotional suffering, the alleged conduct must be extreme and outrageous, "involving particularly egregious facts." *Hubbard,* 330 N.W.2d at 439. Because the conduct suggested by these facts potentially fits within this standard, I would hold emotional distress damages are recoverable under either the custodial interference or intentional infliction tort. Of course, double recovery is not permitted, and the plaintiff bears a heavy burden in demonstrating "the severity of his mental distress." *Id.*

*Conclusion:*

I agree with the majority that "best interests" of a child should be considered, but not to the exclusion of other principles. The majority does not consider the child's best interests during the seven years Jessica and her father were denied familial privileges, yet the majority now laments that Loree Dunn has not seen her daughter for two years since Jessica was reunited with her father. Dunn does know, however, where Jessica and her former husband are. During those seven years, Larson never knew where his daughter was, whether she was healthy, ill or missed him. Larson was deprived of all custody and visitation, despite having been awarded sole custody by the court. How are the principles of fairness and equity applied by denying this tort and not following the trend in other states?

Permitting a cause of action for interference with custody does serve the best interests of the child by encouraging the return of absent children by imposing a civil damages remedy. "A tort suit will be more likely to effect a speedy return of the child; it will result in better cooperation by potential third-party defendants seeking to avoid the suit; potential punitive damages will serve as an additional deterrent; and increased knowledge of a child's whereabouts will result through the broad scope of civil-case discovery." *Wood v. Wood,* 338 N.W.2d 123, 127 (Iowa 1983) (citing P. Hoff, *Interstate Child Custody Disputes and Parental Kidnapping: Policy, Practice and Law,* at 14–1 (1982)). The majority does not consider this possibility, but claims the proper remedy lies in the contempt process. Maj op. at 46; *see* Minn. Stat. ch. 588 (1988). It is inconceivable how service of a contempt order could ever be accomplished when the noncustodial parent, like Dunn in this case, "disappears." *See* Minn.Stat. §§ 588.04; 588.07 (contemplating the service of arrest warrant or order to show cause on contemptor). The majority decries further that "[i]t is clear that this tort would be used as a new weapon" in dissolution cases. *Id.* at 46. As the statistics and the present case confirm, it is parental child kidnappings and accusations of sexual abuse that have become the "new weapons" in dissolution cases.

There are and always have been remedies available to Dunn within the court system, yet she pursued none of them. Instead, Loree Dunn fled the state with Jessica, brazenly defying a court determination of the child's best interests. If one principle stands paramount in our system of jurisprudence, it is that no one person, mother, father, president or pauper stands

above the law. In a case as this, the best interests of the child must be considered together with respect for our legal system.

I would affirm the court of appeals panel.

YETKA, Justice (dissenting).

I join in the dissent of Chief Justice Popovich.

KELLY, Justice (dissenting).

I join in the dissent of Chief Justice Popovich.