[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. INTRODUCTION
"History," James Joyce wrote, "is a nightmare from which I am trying to awake." J. Joyce, Ulysses 28 (H. Gabler ed. 1986). For over six years, Karel Marshak, the plaintiff in this remarkable case, has been trying to awake from the nightmare of her own private history, a history of her own children being forcibly abducted by their father, transported out of the country, and taken on an international odyssey in what has thus far been a successful evasion of all legal processes Ms. Marshak has invoked to obtain their return. The whereabouts of the father, Sheldon Marshak, and the four children, Eric, Joshua, Daniel, and Avi Marshak, are presently unknown. All but Eric have most recently been seen in Brazil.
This is an action for monetary damages brought against four persons remaining in this country who, Ms. Marshak contends, have conspired with the father and each other to deprive her of her children. The four defendants are Sylvia Marshak, Evelyn Marshak, Jacquelyn Marshak, and James Ambadges. (To avoid confusion, all of the Marshaks will hereinafter be referred to by their first names and James Ambadges will be referred to as "Ambadges.") Sylvia is Sheldon's mother, Evelyn and Jacquelyn are his sisters, and Ambadges is his friend. The complaint pleads three different causes of action against each of the four defendants: conspiracy to interfere with custodial relations, intentional infliction of emotional distress, and aiding and abetting the abduction.
The court conducted an evidentiary hearing over a period of three days in November and December 1991. Sylvia, Evelyn, and Jacquelyn all invoked the Fifth Amendment and refused to give any testimony beyond acknowledging that they live at 28 Earl Street in Waterbury. Ambadges was advised of his Fifth Amendment rights by the court, but waived those rights and testified at length. The court also heard the testimony of Robert Irving, a detective in the Cheshire Police Department in charge of the criminal investigation associated with this case; Karel; John Augelli and CT Page 363 Eric Strachan, friends of Ambadges; Saba Ambadges, Ambadges' brother; and Susan Ambadges, Ambadges' wife. The court further received into evidence a number of documentary exhibits. In addition, the court has taken judicial notice of the Superior Court file of a dissolution of marriage action between Karel and Sheldon, Marshak v. Marshak, No. 73483 (Super.Ct. Waterbury J.D. July 2, 1987), aff'd, 17 Conn. App. 835, 556 A.2d 189 (1989) (the "divorce file"). See McCarthy v. Commissioner, 217 Conn. 568, 580
n. 15, 587 A.2d 116 (1991).
At the conclusion of the plaintiff's case-in-chief, the court granted Jacquelyn's motion for a directed verdict as to the three counts (counts three, six, and nine) of the complaint directed against her. That decision was based on the lack of any significant evidence supporting any of those counts. The court's findings of fact and conclusions of law with respect to the counts directed against the remaining three defendants are as follows.
II. FINDINGS OF FACT
A. Background.
Karel and Sheldon were married in Waterbury on March 22, 1975. Karel had two children from an earlier marriage. Four children were born to the Marshaks after their marriage: Eric, on October 12, 1975; Joshua, on July 10, 1979; Daniel, on May 29, 1980; and Avi, on April 7, 1983. (Divorce file.)
At the time of the events in question, the entire family lived in a large house situated on a sizeable parcel of land in Cheshire. Sheldon operated a business, Public Paint and Building Supplies, Inc. in Waterbury. Sylvia, Evelyn, and Jacquelyn lived at 28 Earl Street in Waterbury. (There is ample evidence that Sylvia lived at 28 Earl Street, and it is a fair inference from other evidence in the case that Evelyn and Jacquelyn lived there as well; all three lived there at the time of the hearing.) Sheldon had a cousin, Herbert Marshak, apparently a physician, who operated the Marshak Medical Clinic in Los Angeles, California. (Testimony of Karel Marshak and Robert Irving.)
Ambadges was a friend of Sheldon's who lived in Waterbury with his wife, Susan, and operated a Waterbury body shop known as Ambas Auto Works. He did frequent business with Sheldon and described Sheldon as a business friend only. The court does not find this testimony to be credible. (As will be seen, it finds very little of Mr. Ambadges' testimony to be credible.) The two were close enough that Sheldon took his children to Ambadges' house on more than one occasion, close enough that Ambadges stored a number of vehicles on Sheldon's residential property, close enough that Ambadges himself testified that he and his wife CT Page 364 were planning on building a house next to the Marshaks' home in Cheshire, and close enough that Ambadges was willing to assist Sheldon in abducting his children out of the country. (Testimony of James Ambadges and Karel Marshak.)
B. 1985
James and Susan Ambadges testified that in early June 1985 they met with Karel and Sheldon to negotiate the purchase of part of the Marshak's property to build a house. They further testified that real estate agents were present at the meeting and that an agreement was reached to place a deposit on the property, but no real estate agents or legal documents of any kind were produced at the hearing. The evidence is not sufficiently clear for the court to credit this testimony. It is, however, clear that during the next two months a series of checks began to flow from the Ambadges to the Marshaks. On June 10, Susan wrote a check for $1,000 to Sheldon. On July 1, Susan wrote a check for $1,000 to Karel. On July 15, Susan had three bank checks of $1,000 each made out to Karel. On August 1, Ambas Auto Works made out a check for $3,600 to Sheldon. (Testimony of James and Susan Ambadges; Ex. 1.)
At the end of July or early August 1985, Karel told Sheldon she wanted a divorce. On August 6, Karel consulted with a lawyer for the first time. At about this time, Sheldon went to Ambadges' shop and asked him if he could give Sheldon and his children a ride to JFK Airport in New York the next day. Ambadges agreed. (Testimony of Karel Marshak and James Ambadges.)
At about 7:00 P.M., Sheldon came home with the three older children. Avi, then two years old, was already home in the kitchen. Sheldon, who was six feet tall and weighed three hundred pounds, began yelling at Karel. When she picked up a telephone to call the police, he ripped it out of the wall. He followed her through the house, ripping out telephones as she attempted to reach them. He then picked up Avi and told the others to get in his car. They complied. The older children were upset, and Avi was standing up screaming. Sheldon got in the car, screamed "I'll run you over" at Karel, put the car in gear, sped out of the driveway, and disappeared. Although Karel did not know it at the time, her family life had violently come to an end. She was never to have effective custody of her children again. (Testimony of Karel Marshak.)
At about 8:00 P.M., Karel called Sylvia and told her what had happened. She asked if Sheldon was there. Sylvia said "No" and hung up. A few minutes later, however, Karel's brother observed Sheldon's car in Sylvia's driveway. Jacquelyn later told Karel that Sheldon was at 28 Earl Street between 8:00 and 8:30. Shortly CT Page 365 thereafter Ambadges testified that it was between 8:00 and 9:00 P.M.) Sheldon drove to Ambadges' house with all four children. They entered the house and remained there for forty-five to sixty minutes. Ambadges testified that all five looked normal, as if nothing were amiss. The court does not find this testimony to be credible and is convinced that Ambadges was lying during his entire testimony relating to the events being described. This conclusion is based upon Ambadges' demeanor, upon the tendency of his memory to fail at remarkably convenient times, upon his subsequent lies to Karel about to be described, and upon the utter improbability of four young children who have been violently abducted from their home and from their mother under the circumstances just described all appearing to be utterly normal less than two hours later. (Testimony of Karel Marshak and James Ambadges.)
Karel was up all night. At 1:00 A.M. on August 7, Herbert called her from California and asked what was going on. She told him, and he hung up. At 2:30 A.M., Sheldon called, telling her that he was in New York. He further said that he was going to take the children to the Bronx Zoo, get some counseling from a rabbi and return home the next evening. (Testimony of Karel Marshak.)
Between 7:30 and 8:00 A.M., Sheldon again came to Ambadges' house with his children. He left after a time and later returned. Ambadges then drove all five to JFK Airport in Sheldon's car. Ambadges again testified that all four children appeared to be normal, but again, for reasons already described, the court does not find this testimony credible. It is instead, a fair inference from the facts already described and about to be described that Ambadges knew very well that he was participating in a forcible abduction. His assistance was not limited to driving. On the way, he stopped at the State Department Office in Stamford and identified Sheldon so that Sheldon could obtain passports for the four children. (The passport applications were submitted into evidence as Ex. 3-6.) Ambadges then proceeded to leave his five passengers at the airport. He drove Sheldon's car back to Waterbury and parked it in front of his house, where it remained until it was towed by the police on August 26. Sheldon then took the children by airplane to Tel Aviv, Israel. As far as can be determined, they have never returned to this country. (Testimony of Karel Marshak and James Ambadges.)
At about 1:30 A.M. on August 8, Karel, worried that Sheldon had not returned, called Ambadges. He told her that he hadn't seen Sheldon in days. Later that day, she called Sylvia. Sylvia told her that she hadn't seen Sheldon anywhere. (Testimony of Karel Marshak.) CT Page 366
The next day, August 9, Karel called Ambadges again. By now she was understandably distraught. Ambadges told her that he hadn't seen Sheldon and didn't know anything. (Testimony of Karel Marshak.)
There were two different legal developments of note on August 9. First, Karel filed an ex parte application for a protective order and a dissolution of marriage complaint in the Superior Court for the Judicial District of Waterbury. The Hon. Robert Glass granted the protective order and additionally granted Karel full custody of all four children. He set a hearing on the application for August 19. Second, the Hon. John Ottaviano, Jr. signed a warrant for Sheldon's arrest for the crimes of disorderly conduct and reckless endangerment in the first degree based on the incident of August 6. This warrant has never been served. (Divorce file; Court's Ex. 2.)
On August 16, Ambadges went to Karel's house and removed some vehicles that he had stored in a garage on the Marshak's property. She asked him if he had seen Sheldon. He denied all knowledge of Sheldon's whereabouts. Ambadges admitted in court, however, that Sheldon called him weekly for the first four to six weeks after the abduction and less frequently afterwards. (Testimony of Karel Marshak and James Ambadges.)
On August 19, a hearing on Karel's application for temporary protective and custody orders was held before the Hon. Julius Kremski. Judge Kremski continued Judge Glass' order of August 9 for ninety days. (Divorce file.)
At about this time, Karel, who had been frantically calling a number of governmental agencies, discovered that her husband and children had flown to Tel Aviv. She thought that she would never see them again. (Testimony of Karel Marshak.)
On August 22, a newspaper article describing Karel's search for her husband and children appeared in the Waterbury Republican, accompanied by a large photograph of the children. (Waterbury Republican, August 22, 1985, p. B-3, col. 1 (Ex. V)).
On August 26, as noted above, the police found Sheldon's car in front of Ambadges' house and towed it away. (Testimony of Karel Marshak and James Ambadges.)
On September 22, Karel saw Sylvia. Sylvia told her that Sheldon had called about two weeks before. When Karel asked her where Sheldon was, Sylvia said she didn't know. (Testimony of Karel Marshak.)
On September 23, Ambadges removed more vehicles from Karel's CT Page 367 property. He said nothing about Sheldon. (Testimony of Karel Marshak and James Ambadges.)
On October 15, Sheldon called Karel. He told her that if she did not withdraw her dissolution of marriage action, she would never seen her children again. (Testimony of Karel Marshak.)
On October 28, the Hon. John Reynolds awarded custody of all four children pendente lite to Karel. (Divorce file.)
C. 1986
On February 10, 1986, Karel flew to Tel Aviv. She hired an attorney and an investigator to find Sheldon and her children. (This and all findings as to 1986 and 1987 are based on the testimony of Karel Marshak unless otherwise noted.)
On March 5, as a result of a number of leads, Karel saw her children in a hotel lobby in Jerusalem. Sheldon was there and became belligerent. In her testimony, Karel described her children as "frightened little strangers." She saw her children again on March 1, with Sheldon present, and took them to a park and a museum.
Karel moved to Jerusalem. She began legal proceedings in the District Court of Jerusalem. On April 22, Karel and Sheldon filed a written agreement in that court. Under the terms of this agreement, the parents were awarded joint custody of all four children. Sheldon agreed to return the children to the United States by no later than June 28, 1986. (A translation of this agreement appears in the divorce file.)
Karel returned to the United States to await the return of her children.
Neither Sheldon nor the children returned.
On or about June 6, 1986, Mark C. Ruchman, M.D., an ophthalmologist in Waterbury who had treated Joshua and Avi in the past, received a letter (Ex. R.) requesting the release of Avi's records to a Dr. Levada in Waterbury. The typewritten letter was signed "S. Marshak," but the signature is not that of Sheldon Marshak.
In November, Karel learned that Sheldon was ill. On November 18, she returned to Israel. She discovered where Sheldon was living. (He had moved.) When she entered his apartment, a woman in the apartment (not known to her) physically attacked her. The children were in the apartment, but the attack thwarted any possibility of Karel obtaining their physical custody. She was, CT Page 368 moreover, alone in a strange country, did not speak the language, and did not, at this point, know where to turn. On November 27, she returned to the United States.
D. 1987
On June 28, 1987, Karel flew to Israel for the third time.
On July 2, an opinion granting a dissolution of the Marshak's marriage was filed by the Hon. Robert Wall. (The hearing had occurred before Karel's departure for Israel.) Judge Wall found that Sheldon had "hid" the children "out in this country and surreptitiously, without the knowledge and permission of [Karel], took them to Israel." He noted that Sheldon had failed to attend any of the hearings. He found both an irretrievable breakdown of the marriage and intolerable cruelty by Sheldon to Karel. Sole custody of the children was awarded to Karel. (Divorce file.)
At about this time, Sheldon commenced court proceedings in Jerusalem in an attempt to gain custody of his children. Karel participated in this litigation. Although at the evidentiary hearing in the instant case, Karel testified as to certain statements made by Sheldon at the Israeli hearing, these statements were inconclusive, and the court makes no findings based upon them.
Between July and September, Karel saw her children a number of times. She was alone with all four children two or three times. She was, however, in no position to take them out of the country. She did not have passports for them, had no transportation, and had no one to help her. She could not speak or read Hebrew. The American Consulate in Jerusalem would not assist her. And Sheldon knew where she was.
On November 19, the Jerusalem court awarded custody of all four children to Karel. It stayed its decision for fifteen days to allow Sheldon to appeal. Sheldon took the children out of school, and he and the children disappeared.
On December 7, Karel swore out a complaint against Sheldon before the American Consul in Jerusalem. (Ex. 2.)
E. 1988
On January 5, 1988, a letter was sent from 28 Earl Street in Waterbury to local authorities requesting birth certificates for Sheldon, Joshua, Daniel and Avi. A second letter from 28 Earl Street requesting a birth certificate for Eric followed on January 6. (Ex. J K.) Necessary funds were enclosed. The letters were signed "Sheldon Marshak," but the signatures were not those of CT Page 369 Sheldon. Based on the address and a subsequent admission by Sylvia, the court finds that these letters were sent by Sylvia.
On January 7, Evelyn sent a Federal Express overnight letter to one Martin Elefant in Geneva, Switzerland through the intermediary of the Marshak Clinic in Los Angeles. (This finding and subsequent findings involving Federal Express transmittals are based on materials delivered to the Cheshire Police by the Federal Express Corporation pursuant to a subpoena. (Ex. L.)) This was the first of a series of Federal Express mailings to Mr. Elefant in the first half of 1988. All were sent through the Marshak Medical Clinic in Los Angeles.
On January 14, the Hon. Richard Damiani signed a second warrant for the arrest of Sheldon. (Court's Ex. 3.) This warrant is for four counts of custodial interference in the first degree. Like the 1985 warrant described earlier, it has never been served. Both warrants were outstanding at the time of the hearing.
On January 27, Dr. Ruchman sent copies of Avi's and Joshua's records to Sheldon at an address in Jerusalem. He stated in his cover letter that he was doing so because "Your sister was in the office today." (Ex. T.)
Sheldon at about this time traveled from Vienna to Amsterdam to Aix les Bains, France. (Testimony of Robert Irving.) Aix les Bains is extremely close to Geneva. (Ex. P.)
On February 15 and February 22, Sylvia sent overnight letters to Mr. Elefant in Geneva. On March 2 and March 24, two letters were sent to Mr. Elefant from "S. Marshak." The March 24 letter was sent priority mail. On April 15, an overnight letter was sent to Mr. Elefant from "S. Marshall." On May 2, an overnight letter was sent to Mr. Elefant from Sylvia.
On May 27, Detective Irving talked to Sylvia at her home. She told him that she had no idea where Sheldon was. Detective Irving showed her the applications for birth certificates. (Ex. J. K.) Sylvia admitted that she had obtained the birth certificates because Sheldon needed them. She then said that Detective Irving should talk to Evelyn.
Detective Irving then talked with Evelyn at her place of employment. Evelyn said that she had no idea where the children were. She said that Sheldon would periodically telephone her. She opined that, "Not even someone as wise as Solomon would know how to get out of this situation." She said that she had sent the birth certificates off, but not to him. She would not say to whom. (Testimony of Robert Irving.) It is a fair inference from the evidence that Evelyn sent the birth certificates to Mr. CT Page 370 Elefant in one of the Federal Express deliveries, most likely that of January 7.
Sylvia sent overnight letters to Mr. Elefant on May 31, July 13, and July 15.
In October, Evelyn told Karel that she had had telephone conversations with Sheldon and the children. (Testimony of Karel Marshak.)
F. 1990
In October 1990, Karel learned that Sheldon and the children were in South America. She began searching for them there. (Testimony of Karel Marshak.)
G. 1991
In June 1991, Karel flew to Brazil. On June 18, Sheldon was arrested in Sao Paulo and Joshua, Daniel and Avi were found there as well. (Eric, who was then fifteen, was not found.) Karel briefly saw Sheldon in a police station. Before she could obtain custody of the children, Sheldon was released. He and the children once again disappeared. They have not been seen since. In July, Karel returned to the United States. (Testimony of Karel Marshak.)
H. Additional Findings
Certain additional facts are supported by the evidence presented to the court. In the cases of Sylvia and Evelyn, the court draws an adverse inference from their refusal to respond to any questions whatsoever concerning their actions described above. As Sylvia and Evelyn (through their attorney) conceded at oral argument, such an inference is permissible in a civil action. See Olin Corp. v. Castells, 180 Conn. 49, 53-54, 428 A.2d 319 (1980).
Karel's testimony amply establishes that Sheldon was not and is not a person of independent means. Judge Wall's memorandum of decision (contained in the divorce file) indicates that, except for some life insurance and individual retirement accounts, the only significant asset of the marriage was the house. When Karel was in Israel, Sheldon had no job. The only work she saw him do was the occasional repair of a car in the street. Anyone who has traveled abroad for even one week alone knows that international travel is an expensive proposition. The cost of traveling from country to country for six and a half years with four children is obviously astronomical, even if one lives frugally and works occasionally. It is as plain as the proverbial pikestaff that Sheldon has had outside financial assistance and plenty of it. It CT Page 371 is a fair inference from the evidence that Sylvia's numerous Federal Express mailings to the mysterious Martin Elefant in Geneva using the intermediary of the Marshak Clinic in Los Angeles have been an important means of providing such assistance. The proximity of Geneva to Aix les Bains, France; the use of the Marshak Clinic in Los Angeles as an intermediary (suspicious both because of Herbert's ties to Sheldon and because there is no need to send things from Waterbury to Geneva through California unless one is trying to avoid detection); Evelyn's admission that she had sent the birth certificates off but not to Sheldon; and Sylvia's refusal to testify concerning these affairs, all point to one conclusion: Sylvia has been knowingly supporting Sheldon in his status as a fugitive for years. This, of course, has worked to deprive Karel of the custody of her children.
Financial assistance is not the only kind of assistance that Sheldon has required and received. The birth certificates that Evelyn sent him in 1988 (albeit indirectly through California and Switzerland) have also enabled him to maintain his fugitive status and to deprive Karel of the custody of her children.
It is also very clear from the evidence that Sylvia, Evelyn, and Ambadges have fully understood and appreciated the effect of their actions since at least August 6, 1985 (and, in all likelihood, since well before that dramatic day). The court's conclusions with respect to Ambadges on this subject have already been discussed. There is overwhelming evidence that Sylvia and Evelyn knowingly harbored Sheldon and the children the night before they left the country. Sheldon's fugitive status has, of course, been readily apparent to all since that date. All three remaining defendants have had ample notice of Karel's search for her children and have done everything in their power to frustrate that search by pleading ignorance when they have had knowledge. Beyond this, as already indicated, Sylvia and Evelyn have affirmatively interfered with Karel's attempts to regain custody of her children by supporting and maintaining Sheldon in his fugitive status abroad. They have had, to repeat, full knowledge that this would be the effect of their actions.
It is further clear from the evidence that Sylvia and Evelyn, who are mother and daughter living in the same house, have at all times been acting in concert with each other as well as with Sheldon. They have for six and a half years conspired to conceive and maintain a sophisticated, covert, international joint operation to maintain Sheldon's fugitive status and deprive Karel of her children.
Karel testified that she has sustained substantial economic damages as a result of the abduction of her children. This testimony was credible and uncontradicted. She specifically CT Page 372 testified that the cost of her first trip to Israel was $18,000 including air fare, hotel, an apartment, transportation, food, and the cost of Israeli attorneys and investigators; she spent $250 for psychiatric counseling; the cost of her second trip to Israel was $3,336; the cost of her third trip to Israel was $29,355, including air fare, passports, hotels, investigators, and a psychologist; she spent $1,400 in 1988 for an investigator and $23,500 in attorney's fees; she spent $4,175 in 1990 for an investigator in France; her trip to Brazil cost $26,433, including air fare, hotel, an investigator, a translator, and the loss of three months' salary; and her telephone bills attributable to her search since 1985 have totaled $3,550. The total amount of these costs is $109,999. Karel's claim for the $23,500 in attorney's fees she incurred in 1988 is troubling both because of the amount and because it is not clear how much of those fees are attributable to this case, which began in January 1988, or to the divorce, which was on appeal until 1989. Lacking additional detail, the court cannot find that this fee can be awarded as damages in this case. The court finds, however, that the other expenses just described are reasonable and have been proximately caused by the actions of Sylvia, Evelyn and Ambadges. The total of those reasonable expenses is $86,499.
The court finally finds that Karel has suffered severe and extreme emotional distress from August 6, 1985, to the final hearing date in this case of December 19, 1991, as a result of the abduction of her children. The actions of Sylvia, Evelyn, and Ambadges have directly and proximately caused this distress.
III. CONCLUSIONS OF LAW
A. Liability
1. The Causes of Action
As mentioned in the Introduction, Karel has pleaded three different causes of action against each defendant: conspiracy to interfere with custodial relations, intentional infliction of emotional distress, and aiding and abetting the abduction. Intentional infliction of emotional distress is a recognized tort in Connecticut. Peytan v. Ellis, 200 Conn. 243, 253,510 A.2d 1337 (1986). While conspiracy and aiding and abetting have also been recognized as appropriate vehicles for imposing civil liability in Connecticut, — see Williams v. Maislen, 116 Conn. 433,437, 165 A. 455 (1933) (conspiracy); Carney v. DeWees,136 Conn. 256, 262, 70 A.2d 140 (1949) (aiding and abetting) — neither of these vehicles can stand alone. Each depends upon the existence of a valid underlying cause of action. In this case, Karel relies on an underlying cause of action for which no direct Connecticut precedent (either favorable or unfavorable) exists: a CT Page 373 tort once called harboring and now variously referred to as interference with parental rights or child abduction.
Because intentional infliction of emotional distress is a recognized cause of action in Connecticut, it is tempting to rely upon it here. The abduction of a child is, after all, likely to cause a parent extreme emotional distress, and some courts in other jurisdictions have chosen to rely on this established tort in child abduction cases. See Kajtazi v. Kajtazi, 488 F. Sup. 15
(E.D.N.Y. 1978); Pankratz v. Willis, 155 Ariz. 8, 747 P.2d 1182
(Ariz.App. 1987); Sheltra v. Smith, 136 Vt. 472, 392 A.2d 431
(1978). But while the pouring of new wine into old bottles is a technique well known to the common law, there are problems in doing it here. The intentional infliction of emotional distress ordinarily occurs in the context of outrageous behavior (such as a practical joke carried to outrageous extremes) directed at the plaintiff herself. See W. Keeton, Prosser and Keeton on The Law of Torts, 61 (5th ed. 1984), and examples cited therein. One of the elements of the tort is "'that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct.'" Peytan v. Ellis, supra, 200 Conn. at 253 (quoting Murray v. Bridgeport Hospital, 40 Conn. Sup. 56, 62, 480 A.2d 610 (1984). In a child abduction case not brought by the child, the establishment of this element requires some elasticity in language, unless the evidence establishes (which it does not here) that the child was abducted for the specific purpose of tormenting the parent. Of course a child abductor ought to realize that the emotional distress of a parent is a likely result of his conduct, so the application of the tort is not completely farfetched in this context, but it is more direct and logical to consider child abduction as a separate tort if it is legally permissible to do so.
The ancient common law of England allowed an action of trespass for the abduction of a child, but only where the plaintiff was the father and the child was the son and heir. Otherwise it was thought that the father (and, needless to say, the mother) had no property interest to assert. Barham v. Dennis, 78 Eng. Rep. 1001 (1600). This was so in spite of the fact, as Barham itself acknowledged, that a writ of trespass would lie "for a parrot, a popinjay, a thrush, and . . . a dog." Id. at 1001. It was later held that the father could maintain an action of trespass where a child, other than the heir, was old enough to do him service. Hall v. Hollander, 107 Eng. Rep. 1206 (1825). With that, the development of English law stopped. In 1930, however, the Court of appeals of New York repudiated the English rule in the seminal case of Pickle v. Page, 252 N.Y. 474, 169 N.E. 650
(1930), and an irreversible American trend began.
Pickle reasoned that "the wound to the parent's feeling is a CT Page 374 direct injury inflicted at the moment of the commission of the wrong" and that it was anomalous to make the recovery of "a compensable damage, directly inflicted . . . dependent upon proof of a logically immaterial fact (i.e. a loss of service)."169 N.E. at 652. Consequently, it held that "in actions for the abduction of immature children from the custody of their . . . parents . . . no loss of service need be alleged or proven; that for the direct injury done, a direct recovery may be had without resort to the fiction that a loss of service has been occasioned." Id. at 653. Prosser and Keeton state that the "modern view" is "that the real cause of action is the interference with the relation." W. Keeton, supra, at 924. In 1938, the American Law Institute recognized "inducing [a] minor child to leave or not to return home" as an actionable tort. Restatement (First) of Torts Sec. 700 (1938). The Second Restatement now provides that, "One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent." Restatement (Second) of Torts Sec. 700 (1976).
The court concludes that the tort of child abduction should be recognized in Connecticut. It does so for two reasons. First, as the authorities just cited illustrate, recognition of the tort is based on sound policy reasons. Any requirement that a parent whose child has been abducted prove a loss of services devalues both the loss of an immature child and the feelings of the parent in a way wholly inconsistent with modern motions of the parent-child relationship. Second, the tort has been recognized by the vast majority of modern courts that have considered the issue. See DiRuggiero v. Rodgers, 743 F.2d 1009, 1017-18 (3d Cir. 1984); Lloyd v. Loeffler, 694 F.2d 489, 495-97 (7th Cir. 1982); Hinton v. Hinton, 436 F.2d 211, 212-13 (D.C. Cir. 1970); Borer v. American Airlines, Inc., 19 Cal.3d 441, 563 P.2d 858, 865 n. 3,138 Cal.Rptr. 302 (1977); D D Fuller CATV Construction, Inc. v. Pace, 780 P.2d 520, 523-24 (Colo. 1989); Wood v. Wood,338 N.W.2d 123 (Iowa 1983); Murphy v. I.S.K. Con. of New England, Inc.,409 Mass. 842, 571 N.E.2d 340, 351-52 (1991); Plante v. Engel,469 A.2d 1299 (N.H. 1983); McBride v. Magnuson, 282 Or. 433, 578 P.2d 1259,1260 (1978); Hershey v. Hershey, 467 N.W.2d 484, 488-89
(S.D. 1991); Silcott v. Oglesby, 721 S.W.2d 290 (Tex. 1986). C.f. Bedard v. Notre Dame Hospital, 89 R.I. 195, 151 A.2d 690
(1959) (recognizing cause of action but allowing only nominal damages for mental anguish unaccompanied by physical illness). A complete list of citations through 1990 can be found in Larson v. Dunn, 460 N.W.2d 39, 44-45 n. 3 (Minn. 1990).
The only significant modern case to have opposed this trend (apart from the intentional infliction of emotional distress cases mentioned earlier) is Larson v. Dunn, supra, a 4-3 decision of the CT Page 375 Minnesota Supreme Court. The majority in Larson declined to follow the trend "[f]or the good of our children,"460 N.W.2d at 45, reasoning that "[i]t would place innocent children in the middle of a vigorous, probably vicious, lawsuit between their parents," id. at 46. Larson acknowledged that its reasoning does not apply to actions against unrelated third parties. Id. at 46 n. 3. (Ambadges can thus take no comfort from that decision.) The concerns raised by Larson are, moreover, entirely misplaced in the context of the instant case, where the children in question have been abducted out of the country and cannot appear in court at all. More generally, this court agrees with the Supreme Court of Iowa that recognition of this cause of action is consistent with the best interests of the child because it is "more likely to effect a speedy return of the child." Wood v. Wood, supra,338 N.W.2d at 127.
A comment to the Restatement contains an important qualification that must now be discussed. "When the parents are by law jointly entitled to the custody and earnings of the child, no action can be brought against one of the parents who abducts or induces the child to leave the other." Restatement (Second) of Torts Sec. 700 comment c (1976). This, at first blush, gives some comfort to the defendants here, for Sheldon had joint custody of the children until August 9, 1985, by which time they were in Israel and Ambadges' role (and Sylvia's and Evelyn's initial roles) had already been played. The defendants implicitly rely on this qualification in their briefs. This argument, however, not only overlooks the outrageousness of their actions prior to August 9, 1985, but it ignores the actual policy of the law.
The proscription of the Restatement is expressly directed only at actions "brought against one of the parents." Actions against third parties assisting those parents stand on an altogether different footing. All of the defendants here are third parties who have had no right to custody of any of the children at any time and no right to decide who should have their custody. Here, as in Rosefield v. Rosefield, 221 Cal.App.2d 431,34 Cal.Rptr. 479 (1963), the actions of the third parties "did not simply help the father to gain custody of the child, as from a stranger, but effectively deprived the mother of a right, elemental and of value inestimable, which she, too, had."34 Cal.Rptr. at 481. Our penal code forbids the abduction of a child from a parent. Conn. Gen. Stat. Sec. 53a-97-98. As Rosefield points out,
 This proscription . . . is not lifted from a third person merely because his acts are cojoined with those of the father who, unless a court has acted, has equal rights with the mother. It is CT Page 376 not the office of the third person to make the decision in fact, though not in law, as to custody, and to make ineffectual the later decree of the court.
34 Cal.Rptr. at 481. See Hershey v. Hershey, supra,467 N.W.2d at 488.
Civil actions for conspiracy and aiding and abetting are, as noted supra, recognized means of imposing liability for damages in Connecticut (although, as mentioned, they may not exist independently of some valid underlying cause of action). The Connecticut Supreme Court has explained that,
 The requisites of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff.
Williams v. Maislen, supra, 116 Conn. at 437. "The action is for damages caused by acts committed to a formed conspiracy rather than by the conspiracy itself." Cole v. Associated Construction Co., 141 Conn. 49, 54, 103 A.2d 529 (1954). "For anything done in fulfillment of the common purpose," either by himself or by a co-conspirator, each of the conspirators is "liable in solido." McCandless v. Furland, 296 U.S. 140, 165 (1935). Where a conspiracy has achieved its object, as did the one here, "[t]he purpose of the conspiracy concept . . . is not to punish merely preparatory conduct — a more suitable function for criminal law than for tort law — but to identify the tortfeasors." Lloyd v. Loeffler, supra, 694 F.2d at 497.
The basis of liability with respect to aiding and abetting is set forth in Restatement (Second) of Torts Sec. 876 (1977). Carney v. DeWees, supra, 136 Conn. at 262. Sec. 876 provides that "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance to the other so to conduct himself." Aiding and abetting, unlike conspiracy, does not require an agreement. United States v. Arbelaez, 812 F.2d 530, 533 (9th Cir. 1987).
2. Sylvia Marshak CT Page 377
In light of the foregoing principles, Sylvia's liability for conspiracy and aiding and abetting the abduction is amply established by the evidence. The substantive tort of child abduction, of course, has been committed by Sheldon. With knowledge that Karel did not consent, Sheldon abducted four minor children from a parent legally entitled to their custody. See Restatement (Second) of Torts Sec. 700. The court finds that the four elements of conspiracy have been established with respect to Sylvia:
(1) There was a combination between Sylvia, Evelyn, and Sheldon. Their combined actions and common purpose are fully established by the evidence. "It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement." United States v. Paramount Pictures, 334 U.S. 131, 142 (1948).
(2) The conspirators agreed to do a criminal or an unlawful act or a lawful act by criminal or unlawful means. Here, as in Rosenfield v. Rosenfield, supra, "it was a legal wrong for the husband and father to abscond with the child."34 Cal.Rptr. at 482. Sheldon, as already recounted, has been charged with a number of crimes stemming from the abduction. The act of taking four children out of the country against the will of even one custodial parent, removing those children effectively from legal control, concealing them, and leaving the remaining parent utterly bereft of the means of enjoying any of the privileges of parenthood, is as wrongful an act as the human mind can conceive. Id.
(3) A multitude of acts have been done by one or more of the conspirators pursuant to the scheme and in furtherance of the object. The conspiracy here has fully succeeded.
(4) The acts done by the conspirators have damaged Karel to an immeasurable degree.
With respect to aiding and abetting, Karel has been grievously harmed by Sheldon's tortious conduct, and Sylvia has known that that conduct constitutes a breach of duty and has given substantial assistance to Sheldon to so conduct himself. Restatement (Second) of Torts Sec. 876(b).
The court understands that as Sheldon's mother, Sylvia may possibly have had some benign motives in doing what she has done (although she declined to testify to this, or any other, effect). Her conduct and assistance, however, has clearly played an important role in allowing Sheldon to flee the country with the children and allowing him to remain at large for over six years. CT Page 378 This is a shocking and outrageous situation which simply cannot be condoned. Without Sylvia's active cooperation, Sheldon would have found it much more expensive and inconvenient to do what he has done. By helping him abduct and conceal his children, Sylvia became a joint tortfeasor "in the original sense of the term." Lloyd v. Loeffler, supra, 694 F.2d at 497.
3. Evelyn Marshak
Evelyn's liability for conspiracy and aiding and abetting the abduction is also established by the evidence. The elements of the conspiracy have been discussed with respect to Sylvia and need not be repeated here. The court recognizes that the evidence with respect to Evelyn is less strong than it is with respect to Sylvia, but it is still sufficiently strong that the court finds that Evelyn was part of the conspiracy.
With respect to aiding and abetting, the sending of the birth certificates to Sheldon by way of Mr. Elefant constituted substantial assistance to Sheldon in allowing him to take the children on an international odyssey in violation of American and Israeli court orders.
4. James Ambadges
Ambadges' conduct differs from Sylvia's and Evelyn's in that it was largely limited to assisting Sheldon in the initial abduction of August 6-7, 1985. Ambadges' role was, however, a crucial one, for he took Sheldon and the children to the airport and enabled them to get passports. Without this assistance, none of the remaining events of this sad case would have been possible. The court finds Ambadges' assistance to have been both substantial and necessary. The court has already found that he acted with full knowledge of what he was doing in combination with Sheldon. Under the circumstances he became a co-abductor and, like Sylvia and Evelyn, a joint tortfeasor in the original sense of the term.
B. Damages
The amount of the damages remains to be determined. As previously discussed, Karel has incurred reasonable expenses of $86,499 as a direct result of the abduction. She is plainly entitled to recover this sum as "reasonable expenses incurred by [her] in regaining custody of the child[ren]." Restatement (Second) of Torts Sec. 700 comment g (1977).
Karel has also suffered the loss of society of her children and extreme emotional distress resulting from their abduction for a period of six and a half years. She is entitled to recover fair, just, and reasonable compensation for these injuries as CT Page 379 well. Restatement (Second) of Torts Sec. 700 comment g (1977) expressly allows such recovery. So have virtually all courts that have recognized the tort of child abduction. The only discovered precedent to the contrary, Bedard v. Notre Dame Hospital,89 R.I. 195, 151 A.2d 690 (1959), is somewhat dated and is well outside the mainstream of American jurisprudence on the subject. In a case like this involving a series of outrageous intentional acts and emotional distress that has at all times been completely forseeable, an award of damages for loss of society and emotional distress is justified.
Some discoverable precedent exists on jury awards in cases of "destruction of the whole package of custodial rights, when defendants have aided and abetted child-snatching from the custodial parent." Ruffalo v. United States, 590 F. Sup. 706,713 (W.D.Mo. 1984). Ruffalo found that jury awards for this "package" had been "$65,000 and $70,000" in 1984. Id. A comparable award was given in Lloyd v. Loeffler, 539 F. Sup. 998,1003 (E.D.Wis.), aff'd, 694 F.2d 489 (7th Cir. 1982). More recent awards have been somewhat higher. In 1987, the Court of Appeals of Arizona affirmed a jury award of $125,000 in an arguably comparable case. Pankratz v. Willis, 155 Ariz. 8,744 P.2d 1182 (Ariz.App. 1987). And a Massachusetts jury, in a recent Hare Krishna case, returned a verdict to a parent of $350,000 for intentional infliction of emotional distress and $20,000 for intentional interference with parental rights. Murphy v. I.S.K. Con. of New England, Inc., 409 Mass. 842,571 N.E.2d 340, 345 (1991). (The judgment was reversed for First Amendment reasons not involved here.)
Each case, of course, must be determined on its own facts. Here, there is ample evidence that Karel has experienced extreme mental anguish of a sort that few people other than survivors of murder victims will ever have to undergo. She has lost four of her children and to this day does not know whether she will ever see them again. Her anguish has lasted over six years. The defendants, to their credit, do not attempt to minimize this loss.
For the combined "package" of loss of companionship, loss of parental rights, and emotional distress, the court finds the non-economic damages here to be eight hundred thousand dollars ($800,000). The court recognizes that this is a great deal of money, but the harm suffered by Karel has also been very great. The court knows of no comparable case in which a parent has lost four children for over six years. As best as the court can fix it, this is the appropriate amount of noneconomic damages in this case.
Total economic and noneconomic damages are, consequently, $886,499. CT Page 380
IV. CONCLUSION
A directed verdict has been granted in favor of the defendant, Jacquelyn Marshak, against the plaintiff, Karel Marshak.
Judgment shall enter in favor of the plaintiff, Karel Marshak, against the remaining defendants, Sylvia Marshak, Evelyn Marshak, and James Ambadges in the amount of $886,499.
Costs are awarded to the plaintiff.
Dated at Waterbury this 16th day of January, 1992.
JON C. BLUE, J. JUDGE OF THE SUPERIOR COURT